CARL WAGNER AND SONS, A Partnership; Carlson-Scheff Corp.; Wagner Bros. Haberdashery, Inc.; Carl's, A Partnership, Plaintiffs,

v.

APPENDAGEZ, INC., Defendant.

No. 76 Civ. 3619–CSH.

United States District Court, S. D. New York.

Jan. 22, 1980.

---

Joseph Heller, New York City, for plaintiffs.

Friedman & Atherton, Boston, Mass., for defendant; Robert D. Kozol, Boston, Mass., of counsel.

## MEMORANDUM OPINION AND ORDER

HAIGHT, District Judge:

The first and fourth named plaintiffs, Carl Wagner and Sons and Carl's, are New York partnerships. The second and third named plaintiffs, Carlson-Scheff Corp. and Wagner Bros. Haberdashery, Inc., are New York corporations. Plaintiffs operate four retail clothing stores in the greater New York City area. Defendant Appendagez, Inc. is a Massachusetts corporation which, in 1976, manufactured and sold wholesale a line of jeans, tops and sweaters under the brand name "Faded Glory." Plaintiffs commenced this action in New York State Supreme Court, New York County, to recover compensatory and punitive damages arising out of defendant's alleged failure to fill and ship orders submitted by plaintiffs. Plaintiffs also asserted that defendant's failure to ship the goods ordered resulted from plaintiffs' refusal to sell at a fixed price as demanded by defendant, in violation of New York State's antitrust statute, referred to as the Donnelly Act, New York General Business Law § 340, and Fair Trade Law, § 369–a et seq. On this aspect of the case, plaintiffs claim treble damages.

Defendant removed the case to this Court on the basis of diversity of citizenship. The

parties waived a jury. Following bench trial, the Court enters the following Findings of Fact, Discussion, and Conclusions of Law.

## FINDINGS OF FACT

1. Plaintiff Carl Wagner and Sons, a partnership, has maintained a retail clothing store at 65–46 Myrtle Avenue, Brooklyn, for over 20 years. Plaintiff Carl's, a partnership, has maintained a similar store at 5121 Fifth Avenue, Brooklyn, for 30 years. In 1960 plaintiff Carlson-Scheff Corp., a New York corporation, opened a similar store at 76 Main Street, Hempstead, New York, moving the store to Great Neck, New York about two years ago. Plaintiff Wagner Bros. Haberdashery Inc., a New York corporation, opened a store at 137 Cedarhurst Avenue, Cedarhurst, New York in April, 1976. The four stores are owned and operated by the three Wagner brothers, Aaron, Albert and Jacob, all of whom gave evidence at the trial.

2. Defendant Appendagez, Inc., a Massachusetts corporation with its headquarters in Norwood, Massachusetts, and showrooms in several American cities, is a manufacturer and wholesale seller of jeans and related clothing items. In 1976 it marketed a line of jeans, tops, and sweaters under the brand name "Faded Glory."

3. During 1976 the plaintiffs submitted a series of orders to Appendagez. Some of those orders were filled and the goods shipped; other orders were not filled. The trial testimony and exhibits cannot be completely reconciled as to the amounts involved. However, plaintiffs agreed to accept, for purposes of this litigation, Appendagez's calculations as set forth in its amended answer to plaintiffs' pre-trial interrogatory no. 9. Thus I find that in 1976, Appendagez received orders from the four plaintiffs totalling $25,089; filled orders totalling $5,484.50, the goods called for by such orders being shipped to plaintiffs; and refused to fill orders totalling the balance of $19,604.50.[1] The breakdown, per store, of orders filled and orders unfilled is as follows:

| Store | Orders Filled | Orders Unfilled |
|---|---|---|
| Myrtle Ave. (Carl Wagner and Sons) | $ 58.00 | $ 2,573.50 |
| Fifth Avenue (Carl's) | 227.00 | 2,175.00 |
| Hempstead (Carlson-Scheff Corp.) | 1,452.00 | 4,993.50 |
| Cedarhurst (Wagner Bros. Haberdashery Inc.) | 3,747.50 | 9,862.50 |
| Totals: | $ 5,484.50 | $ 19,604.50 |

4. The Wagner brothers first became aware of Appendagez's "Faded Glory" line when they observed it, in early 1976, on display at one of the numerous trade shows in New York City organized by the industry. They placed orders then and there. Aaron Wagner spoke to an Appendagez representative from New England, who waited on him because he was free at the time. Ordinarily orders are placed with salesmen who cover the particular geographic area. The initial orders were written for the Myrtle Avenue store, in the name of a salesman, a Mr. Segal, who was the salesman for the Brooklyn territory at that time. Segal's initial orders for the Myrtle Avenue store were dated January 14, 1976. Those orders were filled.

5. Thereafter, plaintiffs planned the opening of the new store in Cedarhurst (which in point of fact opened in early April of 1976). The Wagners wished to feature the "Faded Glory" line at their new Cedarhurst location, which was in a high income,

---

1. The figures contained in this paragraph are derived from defendant's amended answer to plaintiffs' interrogatory no. 9, verified April 12, 1978. In plaintiffs' amended answers to defendant's interrogatories, verified July 20, 1978, it is said:

"For the purposes of this action all plaintiffs accept the defendant's admission that it received orders of the value of $25,089.00 and did not ship $19,604.00."

These are also the figures referred to in plaintiffs' trial memorandum. While plaintiffs' testimony and exhibits at trial could be read to yield slightly different totals, I need not resolve the discrepancies, in view of plaintiffs' pre-trial acceptance of defendant's figures.

sophisticated area. Aaron Wagner telephoned the corporate offices of Appendagez, and asked to be placed in communication with the Appendagez salesman covering that area. This inquiry produced a visit, at the Cedarhurst location, from one Alan Friedman, who identified himself to Aaron Wagner as the Long Island salesman for Appendagez. Upon hearing of the other three stores, Friedman advised that he would write the orders for all four stores, billing them through the Wagner Bros. Haberdashery account in Cedarhurst, so that the Wagners could examine the entire line at one time, and there would be only one billing address. The Wagners agreed to this procedure. A number of orders were placed with Appendagez, through Friedman, for the four stores. To the extent that those orders were unfilled, they form the subject matter of this action.

6. Orders were written up by Friedman on a printed order form prepared by Appendagez. A blank copy of the form then in use appears as DXC. The form consists of three identical copies, identified on the form itself as follows:

"OFFICE–WHITE CUSTOMER CONFIRMATION–CANARY SALESMAN'S COPY–PINK"

The form contains columns for designating the style, color, description, and other information (including price) of the items desired. The form also provides boxes to fill in the "start ship date" and "cancellation date." In the lower left hand corner of the form, the following advice is given by Appendagez to the purchaser:

"Shipments are F.O.B. Norwood, and title passes to Buyer upon delivery to Buyer or to Carrier. The Seller will not issue credit for any allowances, reductions, or materials returned unless Buyer obtains the Seller's written consent of same within 14 days of receipt of goods. No returns will be accepted without written authorization from Appendagez."

This is the sum total of Appendagez's advices to purchasers appearing on the order form. There is no statement to the effect that orders are subject to acceptance by Appendagez at Norwood before they become binding upon the seller.

7. Several days after Friedman wrote up each order, plaintiffs would receive in the mail the yellow "CUSTOMER CONFIRMATION" copy. Those yellow copies, received by plaintiffs, appear as PX1. Several of them, dated in January, 1976, list Segal as the salesman. Orders dated in February, 1976 and thereafter, to the extent that the salesman is identified, refer to Friedman. On most, but not all, of the confirmation copies, the "start ship date" and "cancellation date" are filled in. Sometimes the notation opposite "start ship date" is "A/R," a notation which is not explained in the record. On one order, dated February 20, 1976, the following entry appears under "Special Comments," at the bottom of the form:

"Please start March 15–76. This is a new store opening."

8. Friedman advised Aaron Wagner that the policy of Appendagez required plaintiffs to sell the "Faded Glory" line at "keystone" prices, an industry term meaning a 100% advance over the retailer's cost. The Cedarhurst store began to sell the line at keystone, but the Wagners observed that the line was being sold at discount elsewhere in the area. Concerned with the competitive effect upon their new venture, the Wagners began to sell "Faded Glory" items at a markup of only 80% over wholesale price. The Cedarhurst store featured the line, at discount prices, in its advertising and display windows. This produced a vehement objection from Friedman, who in the late spring came to the Cedarhurst store, photographed the windows in which "Faded Glory" items were displayed at discount, and then had a heated discussion with Albert Wagner and Robert Ernst, the assistant manager of the store. Friedman said that a number of other accounts had complained to Earl Nash, the northeast regional sales manager of Appendagez, about plaintiffs' discounting the "Faded Glory" line. Friedman stated that if plaintiffs did not sell the line at keystone, Appendagez would not fill their orders. Albert Wagner

stressed the competitive necessity to discount. The discussion, described at trial by both Albert Wagner and Ernst, was heated. Jacob Wagner, who had seen his brother Albert, Ernst and Friedman go into the store's office, could hear voices raised in anger through the closed door. At about the time of this incident, plaintiffs began to encounter delays in receiving shipments.

9. A rival store in Cedarhurst, "Ronnie's Slax'n Shirtails," was operated by Ronald Axelrod, who testified at trial. Axelrod carried the "Faded Glory" line, and conformed to the keystone pricing policy. He observed that plaintiffs' Cedarhurst store had opened, and was selling the line at discount. Axelrod complained to his Appendagez salesman, who replied in substance that if plaintiffs' Cedarhurst store did not put up the price, Appendagez would "cut them out." The salesman said he would take the matter up with his superiors. Axelrod could not remember the salesman's name. I find it was Alan Friedman.

■ 10. By mid-May, the Wagners had become increasingly restive over the cessation of shipments from Appendagez. The "Faded Glory" line was popular with buyers, and sold out quickly. The three Wagner brothers decided to beard the Appendagez corporate lion in its den at a trade show in New York on May 20. The Wagners bore down upon Nash, whom they had met amicably in March, as Nash was engaged at the Appendagez display area. The Wagners asked Nash, undoubtedly with some heat, what was holding up their outstanding orders. Nash replied, with equal heat, that the Wagners would have to sell the line at Appendagez's required full markup, or "you're through." The altercation became lively, and began to attract the attention of passers-by. William Colber, the national sales manager, came over, separated the Wagners and Nash, and drew the Wag-

ners aside for what Albert Wagner described as a "lecture" about the necessity of selling at a full markup. The Wagners persisted in their demands that the outstanding orders be filled. The encounter broke up in an atmosphere of hostility and an exchange of uncomplimentary remarks. Plaintiffs retained counsel, who under date of May 27, 1976 wrote to Appendagez at Norwood to protest its decision "not to sell your merchandise to any and all of my clients' stores for the reason my client will not sell at your fixed price." [2]

11. The Wagners' initial orders in January, 1976, in the name of Carl Wagner and Sons at the Myrtle Avenue address, were accompanied by a New Customers Credit Application form (DXD). That form identified the business as a partnership, and gave four credit references. The form came to the attention of Arnold Crocker, the comptroller of Appendagez. After conducting certain credit inquiries, Crocker assigned the Myrtle Avenue store a credit line of $2,000, with payment terms of "net 30." This appears on an internal Appendagez document (DXE). Appendagez never advised the Wagners that this credit limit had been set. There is no convincing proof that even the salesman on the account was informed.

12. Friedman wrote up the first orders for Wagner Bros. Haberdashery, Inc. at Cedarhurst on February 20, 1976. On that date he also processed and forwarded to Appendagez a New Customer Credit Application for that company (DXG). Again acting internally, Appendagez listed Wagner Bros. Haberdashery as having a credit line of $2,000 and payment terms of "net 30" (DXH). Again, Appendagez did not advise the Wagners of the credit limitations.

13. According to Appendagez's accounting department computer printout (DXL at p. 59), as of April 28, 1976 Wagner Bros.

---

2. Letter of Joseph Heller, Esq., PX4. Defendant objected to the exhibit as self-serving hearsay. However, defendant's theory of the case is that plaintiffs fabricated the price fixing allegation in order to recover damages for failure to ship goods resulting from entirely different causes. Counsel for plaintiffs wrote defendant

as the plaintiffs' agent. The statement, reflective of what the Wagners told Heller, is admissible as consistent with their trial testimony, and offered "to rebut an express or implied charge . . . of recent fabrication . . ." Fed.Rules Evid. Rule 801(d)(1)(B).

Haberdashery Inc. of Cedarhurst owed Appendagez a total of $3,443[3] for goods shipped to Wagner. Of that total, only $59 had been owing for 30 days; the balance of $3,383 represented current charges, as to which Wagner Bros. was not in default. Nevertheless, Appendagez placed the Wagner Bros. account on its "Hold for Credit/Delinquency Report" dated April 29, 1976 (computer printout, DXM, pp. 207–208). Crocker testified this action was taken because Wagner Bros. had exceeded the $2,000 credit limit Appendagez had imposed internally upon Wagner Bros., but of which plaintiffs remained sublimely ignorant. When a customer exceeded its credit limit, all shipments were halted. There is a notation in pen on the "hold" printout, DXM, which says "Call O.L." Crocker testified that this reflected an instruction to someone in Appendagez's accounting department to telephone Wagner Bros. and advise plaintiff it was over its credit limit. However, Crocker did not make the call; did not know if anyone else did; and the Wagners testified that no such call was ever received. I find that no such call was ever made.

14. Following the Wagners' heated exchange with Nash at the show on May 20, 1976, Nash recommended to his superiors in Norwood that no further shipments be made to the Wagners. In point of fact, Appendagez forwarded no shipments to plaintiffs subsequent to April 29. Crocker testified that the shipments were stopped for three reasons: a lack of inventory; plaintiffs having exceeded the $2,000 credit limit; and the Wagners' "harassment" of Nash, as reported by Nash to Crocker. I find, however, that the dominant cause of Appendagez's refusal to deal with plaintiffs was the latter's refusal to stop selling the "Faded Glory" line at a discount. That policy of Appendagez, insofar as it was applied to plaintiffs, was declared by Friedman, Nash, and Colber. The cessation of shipments represented the Norwood office's implementation of that policy.

15. Appendagez's operations were of such nature that the Company made decisions, at its Norwood headquarters and warehouse, with respect to which orders it would fill. This was necessary to coordinate manufacture, inventory, and distribution. As a matter of internal corporate policy, the various salesmen in the field did not have authority to bind Appendagez to make delivery by the writing out and forwarding of an order. Appendagez reserved to itself, at the Norwood headquarters, the ability to determine which orders would be filled from inventory, and which would not. While this limitation upon a salesman's authority existed as part of Appendagez's internal procedures, it was never made known to the plaintiffs.

## DISCUSSION

The foregoing Findings of Fact resolve, for the most part, issues of credibility in favor of the plaintiffs. On the central issue, I have found that representatives of Appendagez (Friedman on the salesman level, and Nash and Colber on the executive level) threatened the Wagners with a cutting off of shipments if the plaintiff stores did not adhere to a policy of keystone pricing. Defendant insists that it had no such policy; Nash testified at trial that he never communicated such a policy to the Wagners. However, to conclude that the plaintiffs have fabricated defendant's articulation of a price fixing policy, I must reject as unworthy of belief the testimony of all three Wagner brothers, as well as Ernst and Axelrod; and also disregard counsel's letter of protest of May 27, 1976 as a further device in a perjurious scheme. Having observed the demeanor of the witnesses, I do not believe that they swore falsely. I believe that they told the truth.

While Axelrod's testimony does not bear upon my favorable impression of the credibility of the other witnesses called by plaintiffs, it is appropriate to observe that Axelrod had no apparent motive to color his testimony in plaintiffs' favor. Axelrod has no interest in the litigation. No basis appears for inferring that Axelrod bears Ap-

3. The actual figure was $3,442.56, which the computer rounded up to $3,443.

pendagez any animus. While the documents received in evidence in respect of the "Ronnie's Slax'n Shirtails" account with Appendagez (computer printout, PX6; invoice, DXN; cancelled checks, PX9) do not reveal a particularly active account, they do establish a commercial relationship between Axelrod's store and Appendagez at the pertinent times. To attack the credibility of Axelrod's testimony, Appendagez must argue that the Wagners somehow persuaded Axelrod to fabricate testimony which would corroborate their own. If that were the scheme, however, the Wagners would presumably have rehearsed Axelrod as to the name of the Appendagez salesman quoted by Axelrod in his testimony. On its surface, Axelrod's testimony would have had greater impact if he had identified Friedman as the salesman. The fact that Axelrod could not remember the name of the salesman may reduce the surface impact of his testimony, but in my judgment increases its credibility.

It is also of some significance that neither Friedman nor Colber appeared as witnesses, by deposition or at trial, to dispute the accounts of plaintiffs and their witnesses. Friedman, Colber and Nash were the three Appendagez representatives who, according to plaintiffs, threatened them with reprisal if they did not adhere to the price fixing policy. Of the three, the role of Nash in this regard was the least significant; but he was the only witness produced by the defendant to give evidence on the point. I appreciate that, according to the testimony of Crocker and Nash, neither Colber nor Alan Friedman were in the employee of Appendagez at the time of the trial. Furthermore, Friedman might not have been a fully cooperative witness, since it appears that he filed suit against Appendagez over a dispute about sales commissions. But no showing was made by Appendagez as to its efforts to locate these witnesses to testify upon what was clearly the central issue in the case; and Crocker testified that Friedman's brother was still an employee of the company. Because Colber and Friedman were not employed by Appendagez at the time of trial, their non-appearance as witnesses does not require the inference that their testimony would have been adverse to the company. But the trier of the facts has fewer credibility conflicts to resolve. Nash was in no position to contradict plaintiffs' evidence in respect of what Colber said to the Wagner brothers, or what Friedman said to the Wagners and Axelrod.

The decisive issues will now be considered.

### The Existence of a Contract between the Parties.

Appendagez's threshold contention is that the purchase orders did not give rise to binding contracts until they were accepted for shipment at the Appendagez offices in Norwood. If no contractual obligations came into existence unless and until Appendagez accepted the purchase orders generated by salesmen such as Friedman, then of course the case is at an end, since the purchase orders were not accepted by Appendagez, shipments were not made, and no contractual relationships came into existence.

■ The rights and obligations of the parties are governed by the Uniform Commercial Code, as enacted in the State of New York. Book 62½, McKinney's Consol. Laws of N.Y. (1964). The goods in question were ordered in New York, for delivery in New York; that is a sufficient relationship to the State to render its laws applicable, in the absence of any agreement between the parties on the point. U.C.C. § 1–105(1). The parties have briefed the case in the light of New York authorities, and suggest no other jurisprudence.

Under the statute of frauds incorporated in the Code, a contract for the sale of goods for the price of $500 or more is not enforceable:

> ". . . unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker." U.C.C. § 2–201(1).

In the case at bar, the issue is whether the purchase orders, prepared and signed by

Friedman, constitute writings signed by an "authorized agent" of Appendagez.

■ Appendagez argues that this question must be answered in the negative, since the company did not endow its salesmen with authority to accept orders in the field. I accept this proposition, as a matter of Appendagez's internal policies. But the argument overlooks the familiar principle of apparent authority, defined by the Restatement of the Law of Agency (2d) at § 8 as:

".  .  . the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with other's manifestations to such third persons."

In the case at bar, the Wagners wished to make further purchases from Appendagez. Aaron Wagner telephoned the offices of the company, made that desire known, and asked that the appropriate salesman call upon him. That produced Alan Friedman, complete with order forms, which were completed, Friedman returning to the plaintiffs what was designated as a "confirmation copy." No notice was given to plaintiffs, either orally or in writing on the order form or elsewhere, that the salesman's authority was limited, and that Appendagez did not consider itself bound by the orders until approved at the home office. In these circumstances, Friedman arrived at plaintiffs' premises clothed in the apparent authority to accept orders from plaintiffs binding upon Appendagez; and there were no contrary, outward manifestations in respect of that authority.

The internal limitations which Appendagez placed upon the authority of its salesmen are irrelevant, because such limitations were not communicated to the plaintiffs. The pertinent New York law is summarized in 2 N.Y.Jur.2d, Agency § 88 (1979):

"Since the principal is bound by acts of the agent within the scope of the authority which the principal permits one doing business with the agent to understand is possessed by the agent, the authority of an agent cannot be secretly limited by his principal so as to affect a third party dealing with such agent in ignorance of the limitation. Special or secret instructions or limitations upon the authority of an agent, whose powers would otherwise be coextensive with the business entrusted to him must be communicated to the party with whom he deals, or the principal will be bound to the same extent as though they were not given. Such instructions or limitations are not binding upon a third person who deals with the agent in good faith without knowledge of such instructions or limitations, and in reliance upon the apparent authority with which the principal has clothed him. Thus, the rights of third persons dealing in good faith with an agent within the apparent scope of his authority are unaffected by secret limitations placed on the agent's authority by the principal."

This principle is illustrated by a wide variety of New York decisions. See *Bradford Co. v. Dunn*, 250 N.Y. 461, 166 N.E. 167 (1929); *Ruggles v. The American Central Ins. Co. of St. Louis*, 114 N.Y. 415, 21 N.E. 1000 (1889); *Morrison v. Chapman*, 155 App.Div. 509, 140 N.Y.S. 700 (1st Dept. 1913); *Newman v. Lee*, 87 App.Div. 116, 84 N.Y.S. 106 (2d Dept.1903); *Cox v. Albany Brewing Co.*, 56 Hun. 489, 10 N.Y.S. 213 (3rd Dept.1890).

In *Cox, supra*, plaintiff sued upon an alleged contract by the defendant to employ him at its brewery for one year. Plaintiff proved that, pursuant to a written invitation, he went to defendant's office, and there found a person assuming to employ laborers, who engaged him for one year. The defendant sought to establish that the individual in question was authorized to do no more than employ laborers for one day at a time. The court rejected that internal limitation upon authority as insufficient in law:

"It is a well-settled and elementary rule of law that a special agent, with limited powers, cannot bind the principal, where he acts outside of the scope of his authority, but that rule is subject to this qualification: that where an agent is intrusted

to do a particular kind of business he becomes, as between the principal and parties dealing with him, the general agent for the transaction of that business, and his acts, as between his principal and strangers, in that particular line, will bind the principal, although he violate some private instructions given by his principal, not known to the public."

And the *Cox* court continued:

"As we have seen, any private instructions by the manager of the company 'to Gray, prior to the making of the contract, that no laborer should be hired for a longer time than for one day, not known by or communicated to the plaintiff, would not relieve the defendant from liability, so long as the defendant permitted Gray to act for it at the office in the capacity of an employer of labor." 10 N.Y.S. at 214.

So, in *Newman v. Lee, supra,* and *Morrison v. Chapman, supra,* the acts of individuals placed in positions of apparent authority at stock brokerage houses were held to be binding upon their employers, notwithstanding internal limitations upon their authority, which were not communicated to the third-party plaintiffs. In *Newman,* the court said:

"It is contended by the defendant that, inasmuch as this was a 'discretionary order,' the defendant is not bound by his agent's act. Upon this point, evidence was offered to show that the defendant did not authorize the making of the contract; that he was prohibited from taking this kind of order by the rules of the exchange of which he was a member; and therefore could not authorize an agent to do this class of business. The evidence was rejected. It seems to us that the rules are 'private instructions,' within the meaning of that term as used in the *Cox* Case, above cited. . . . The rules of stock exchanges do not differ essentially, in respect to their operation among persons who are not members, from the by-laws of business corporations. These are binding upon third persons only when those persons have knowledge of them." 84 N.Y.S. at 107.

In *Morrison,* the issue was whether payment made by plaintiffs to one Cooper, the branch office manager of the defendant brokerage firm, constituted payment to the defendant, Cooper having absconded with the funds. Answering that question in the affirmative, the court stated:

"So far as concerns the business transacted through his office, he was held out to the world as the accredited agent and representative of the defendants. The plaintiff was fully justified, therefore, in paying his indebtedness to defendants by means of a payment to Cooper (citing cases). In taking plaintiff's checks Cooper was therefore acting within the apparent scope of his authority, and it is immaterial what secret instructions to the contrary, not known to plaintiff, he may have had." 140 N.Y.S. at 702.

The case at bar presents analogous circumstances. Plaintiffs made known to Appendagez their desire to purchase the latter's goods. They asked Appendagez to send them a salesman for the purpose of receiving orders. Appendagez dispatched Friedman, who wrote up orders in precisely the same manner that plaintiffs' initial orders had been executed, in the name of salesman Segal, those orders having been filled by Appendagez. Friedman had apparent authority to bind Appendagez to those orders, and Appendagez may not avoid the effect of Friedman's apparent authority by reference to limitations which were never conveyed to the plaintiffs.

I am mindful of Appendagez's contention that acceptance of a salesman's orders at the home office, as a condition precedent to a binding contract, is so well known in the industry that plaintiffs must have known of it. To be sure, the terms of an agreement "may be explained or supplemented by . . . usage of trade," U.C.C. § 2–202(a). The "usage of trade" concept is defined by U.C.C. § 1–205(2), which reads in pertinent part:

"A usage or trade is any practice or method of dealing having such regularity of observance in a place, vocation or

trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts."

In the case at bar, Appendagez, seeking by trade usage to avoid contractual obligations which would otherwise arise from the writings and attendant circumstances, bears the burden of proving the "existence and scope of such a usage." It has failed to do so. The only witness giving evidence on the point was Nash. While he testified that in his experience with several clothing companies, including Appendagez, comparable order forms were not regarded as binding until approved by the home office, he also acknowledged on cross-examination that other companies specifically provided, in their order forms that the orders were "subject to acceptance at home office." That concession is fatal to defendant's contention that everyone in the industry should have known that home office acceptance was a condition precedent to a binding contract, even if neither the salesman nor the order form gave notice of the condition to purchasers. I can appreciate the practical reasons why a company like Appendagez would wish to reserve a home office discretion in respect of accepting or rejecting orders generated by their salesmen; however, familiar principles of contract law require that such a reservation be accomplished in a particular way, if it is to be binding upon purchasers. Appendagez has not made the requisite showing, either by specific evidence or proof of a usage of trade, which would remedy the lack of such evidence.

■ For comparable reasons, Appendagez's internal credit limitation placed upon plaintiffs' account is of no legal significance. Not only did Appendagez fail to advise plaintiffs of that credit limitation, their salesmen cheerfully wrote up orders which substantially exceeded it. If Appendagez had advised plaintiffs of the credit limitation, and given them an opportunity to meet the situation by further economic arrangements, the case would be different. In point of fact, Appendagez did neither; and in the circumstances of the case, cannot plead its internal, uncommunicated credit limitation as justification for a refusal to recognize contractual obligations.

■ I have found that Appendagez refused to fill plaintiffs' orders because plaintiffs refused to agree that they would sell the "Faded Glory" line at keystone prices. Appendagez could not legally implement that policy, in view of the New York fair trade law, found in the General Business Law, § 369–a:

"Any contract provision that purports to restrain a vendee of a commodity from reselling such commodity at less than the price stipulated by the vendor or producer shall not be enforceable or actionable at law."

This section, which became effective in August, 1975, governs the transactions between the present parties.

For the foregoing reasons, plaintiffs are entitled to recover on their causes of action for damages resulting from defendant's failure to ship goods which plaintiffs had ordered.

*The Donnelly Act Claim.*

The Donnelly Act, N.Y. General Business Law § 340, provides:

"1. Every contract, agreement, arrangement or combination whereby

"A monopoly in the conduct of any business, trade or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

"Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state is or may be restrained or whereby

"For the purpose of establishing or maintaining any such monopoly or unlawfully interfering with the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy, illegal and void."

This statute, modeled on the federal Sherman Antitrust Act, 15 U.S.C. § 1 *et seq.*, which preceded it by three years, see *State v. Mobil Oil Corp.*, 38 N.Y.2d 460, 464, 381 N.Y.S.2d 426, 428, 344 N.E.2d 357, 359 (1976), has since July 1, 1975 provided in respect of remedies:

"5. An action to recover damages caused by a violation of this section must be commenced *within four years after the cause of action has accrued.* The state, or any political subdivision or public authority of the state, or any person who shall sustain damages by reason of any violation of this section, shall recover three-fold the actual damages sustained thereby, as well as costs not exceeding ten thousand dollars, and reasonable attorneys' fees. At or before the commencement of any civil action by a party other than the attorney-general for a violation of this section, notice thereof shall be served upon the attorney-general. Where the aggrieved party is a political subdivision or public authority of the state, notice of intention to commence an action under this section must be served upon the attorney-general at least ten days prior to the commencement of such action. This section shall not apply to any action commenced prior to the effective date of this act."

■ While there is no pleading or proof that plaintiffs gave the state attorney general notice of their action, that omission does not render the complaint deficient. The giving of such notice, designed to apprise the attorney general of the circumstances, is not considered a condition precedent to the plaintiffs' causes of action. *Columbia Gas of New York, Inc. v. New York State Electric & Gas Corp.*, 28 N.Y.2d 117, 320 N.Y.S.2d 57, 268 N.E.2d 790 (1970).

■ In the case at bar, I have found that Appendagez's price fixing policy was directed at plaintiffs at least in part because of complaints Appendagez had received from other retailers who objected to being undersold. This appears from the Wagners' testimony concerning what Friedman, Colber and Nash said to them; and also from the

testimony of Axelrod. Where a supplier pressures a retailer into raising its prices after receiving complaints from other retailers, and follows through on those threats by cutting off the supply, a violation of the antitrust law declared in the Donnelly Act is established. *Uniroyal, Inc. v. Jetco Auto Service, Inc.*, 461 F.Supp. 350 (D.C.1978). Plaintiffs are accordingly entitled to treble damages under section 340(5).

■ Two evidentiary points must be considered. First, Appendagez argues that under Rule 801(d)(2)(E), Fed.Rules Evid., admissions of a conspiracy are not admissible in the absence of independent proof of the existence of a conspiracy. Reference is made to criminal cases such as *United States v. Watkins*, 600 F.2d 201, 204 (9th Cir. 1979) and *United States v. Weiner*, 578 F.2d 757, 768 (9th Cir. 1978); and to this Court's application of the principle in a civil case, *United States v. One 1975 Lincoln Continental*, 72 F.R.D. 535, 539 (S.D.N.Y. 1976) (forfeiture of vehicle used in drug transaction under *in rem* provisions of 21 U.S.C. § 881(a)(4)). See also *United States v. Calabro*, 449 F.2d 885, 889 (2d Cir. 1971), *cert. denied*, 405 U.S. 928, 92 S.Ct. 728, 30 L.Ed.2d 735 (1972). Because it perceives in the record no independent proof of the existence of a conspiracy, Appendagez contends that the testimony of plaintiffs' witnesses concerning what Friedman, Nash and Colber said to them constitutes inadmissible hearsay.

If independent proof of conspiracy were necessary, plaintiffs could have recourse to the testimony of Axelrod. In point of fact, however, such proof is not necessary to render admissible the statements of Friedman, Nash and Colber, as testified to by plaintiffs' witnesses. Rule 801(d)(2)(E) exempts from the hearsay rule "a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy." In the situation envisioned by the Rule, the only relationship between that of the party and the declarant is that of co-conspirators. Co-conspirators' declarations are admissible against each other only if made "during the course and in furtherance

of the conspiracy." It is this requirement that requires independent proof of the existence of the conspiracy. Judge Weinstein has said, of the "in furtherance" requirement:

"That condition imposes conventional agency theory that the acts of an agent bind his principal only when the agent acts within the scope of his authority." 4 Weinstein's Evidence, p. 801–169 (1979).

But this Rule, and its underlying rationale, have nothing to do with the situation presented by Friedman, Nash and Colber, who were employees, and hence agents in their own right, of the corporate defendant, Appendagez. In those circumstances, the pertinent exception to the hearsay rule is found in Rule 801(d)(2)(D), which characterizes as non-hearsay a statement offered against a party which is "a statement by his agent or servant concerning a matter within the scope of his agency or employment, made during the existence of the relationship." In this context, the authority of the declarant to make the statement is irrelevant; to render the statement admissible under the Rule, it need only appear that the statement was made while a principal-agent or master-servant relationship existed, and that the statement related to a matter within the scope of those relationships. See Weinstein, op. cit., at p. 801–162. Since the declarations attributed to Friedman, Colber and Nash clearly meet those requirements, no further independent proof is required.

■ Secondly, Appendagez moved to strike the testimony of Axelrod, on the basis of plaintiffs' failure to identify him as a witness in a supplemental answer to interrogatories, Appendagez having demanded by interrogatory that plaintiffs identify all their witnesses. Defendant relies upon Rule 26(e), F.R.Civ.P., and *Davis v. Marathon Oil Co.*, 528 F.2d 395 (6th Cir. 1976).

It is quite correct that Rule 26(e) imposes a general duty to supplement discovery responses; and, in appropriate circumstances, a party will be precluded from offering the testimony of witnesses not identified in answers to interrogatories. *Davis* is such a case. A service station lessee whose lease had been cancelled brought an antitrust action against the lessor oil company. Three days before trial, plaintiff amended his answers to identify five new witnesses: a former employee of the plaintiff; two Marathon lessees, one of whom was a personal friend of the plaintiff's; and two Marathon employees working in the area during the pendency of suit. The district court refused to let the witnesses testify. The Sixth Circuit affirmed on the ground that "[r]easonable diligence would have disclosed the additional witnesses far in advance of trial." 528 F.2d at 403. The court held further that in the short time afforded by the notice, "there was virtually no way for Marathon to prepare adequately to respond to the testimony of the surprise witnesses." *Id.* at 404.

Each case necessarily turns on its own circumstances. In the case at bar, Aaron Wagner testified that on the Wednesday prior to the Monday when the case was called for trial, Axelrod, who was attempting to set up a franchise in Jordache jeans, happened to call at the Cedarhurst store. Axelrod and Wagner fell into conversation, during the course of which Wagner learned of Azelrod's prior activities in Cedarhurst, his relationship with Appendagez, and the events to which Axelrod ultimately testified. Wagner asked Axelrod to testify on plaintiffs' behalf; Axelrod's initial reaction was that he was too busy, although he consented to sign a statement, which was executed on that day. In subsequent telephone conversations, Axlerod indicated a willingness to testify; and he did so. I accept Aaron Wagner's testimony on this point. I also formed a favorable impression of plaintiffs' counsel, Mr. Heller, during the trial,[4] and do not believe that he would deliberately withhold from defendant the existence of a witness previously known to plaintiffs. On the contrary, Mr. Heller's

---

4. This is not intended to denigrate defendant's counsel. Both attorneys presented well prepared and skillfully tried cases.

demeanor and comments during the robing room conference before the trial commenced clearly indicated that he did not know whether Axelrod would testify or not. In short, the situation is not comparable to *Davis*, where at least two of the witnesses in question had been known personally to the plaintiff for years, and the court was able to say of all five witnesses that "reasonable diligence" would have disclosed them "far in advance of trial." Axelrod's appearance was fortuitous, and plaintiffs could not have reasonably foreseen him as a source of testimony. Furthermore, Appendagez was able to prepare at least some response to Axelrod's testimony, which was addressed to a single issue. Counsel for plaintiffs showed counsel for defendant a copy of Axelrod's statement during the robing room conference before trial; and defendant was able to locate and introduce certain of its files on Axelrod, in an effort · to attack his credibility, before the trial ended.

Arguably, plaintiffs' counsel should have advised his adversary of Axelrod's identity as a potential witness as soon as he learned of him; but the failure was not wilful, plaintiffs could not reasonably have discovered Axelrod sooner, and Appendagez was not entirely unprepared to respond to his testimony. In these circumstances, I will not strike the testimony.

For the foregoing reasons, plaintiffs are entitled to recover "three-fold the actual damages sustained," a subject to which we now turn.

*Damages*

The dollar amounts of the unfilled orders are set out in the Findings, ¶ 3, and may be recapitulated here:

1. Plaintiff Carl Wagner and Sons — $2,573.50
2. Plaintiff Carlson-Scheff Corp. — 4,993.50
3. Plaintiff Wagner Bros. Haberdashery, Inc. — 9,862.50
4. Plaintiff Carl's — 2,175.00

The "Faded Glory" line sold well (Findings of Fact, ¶ 10), and plaintiffs are entitled to the inference that they would have sold these goods at retail if delivered.

It remains to consider at what price the goods would have been resold. The Wagners testified at trial that they charged keystone prices (twice the wholesale cost) at three of the stores, and at 80 percent of cost at Cedarhurst. However, that is inconsistent with their amended answers to interrogatories (DXB), in which plaintiff Carlson-Scheff Corp., the owner of the Hempstead store, specifically claimed as damages an amount less than wholesale cost, characterizing that amount as "representing an 80% mark-up over cost on the unshipped orders." Albert Wagner verified that answer on July 27, 1978. It was necessary for plaintiffs to amend their original answers in order to increase their damages claims; the amended answers to interrogatories are prefaced by the explanatory paragraph:

"These amended interrogatories are necessary to correct our attorney's misunderstanding as to the meaning of a keystone markup, namely 100% over cost."

The Wagners explained that they had signed and sworn to the original answers without reading them carefully. I accept that, but it is not reasonable to assume that they would do so a second time. In these circumstances, and in view of plaintiffs' inability to document the mark-ups charged, they are bound by their amended answers. It follows that the damages incurred at the Cedarhurst and Hempstead stores (Wagner Bros. Haberdashery, Inc. and Carlson-Scheff Corp. respectively) will be calculated on an 80% mark-up over the cost of the unshipped orders; and the damages incurred at the Myrtle Avenue and Fifth Avenue stores (Carl Wagner and Sons and Carl's respectively) will be calculated on a 100% mark-up.

Thus the damages are:

1. Plaintiff Carl Wagner and Sons — $2,573.50
2. Plaintiff Carlson-Scheff Corp. — 3,994.80
3. Plaintiff Wagner Bros. Haberdashery, Inc. — 7,890.00
4. Plaintiff Carl's — 2,175.00

These calculations of damages conform to U.C.C. § 2–713, which entitles the buyer in a case of non-delivery by seller to damages measured by "the difference between the market price at the time when the buyer learned of the breach and the contract price."

Plaintiffs are entitled to pre-judgment interest, at the legal rate of 6% per year, N.Y.C.P.L.R. § 5004. Pre-judgment interest in breach of contract cases is mandatory under § 5001(a), *Van Gemert v. Boeing Co.*, 553 F.2d 812, 815 (2d Cir. 1977), and is recoverable in actions brought for breach of contracts of sale under the Uniform Commercial Code. *Standard Brands Chemical Industries, Inc. v. Pilot Freight Carriers, Inc.*, 65 Misc.2d 1029, 319 N.Y.S.2d 457 (Sup.Ct. Monroe Cty.1971). Interest runs from "the earliest ascertainable date the cause of action existed," § 5001(b). We cannot be sure when the ordered goods would have been shipped and resold, but January 1, 1977 is a certain outside date, and interest will run from then.

Plaintiffs also claim punitive damages on their breach of contract causes of action. Punitive damages are not available for "mere breach of contract," *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 358, 386 N.Y.S.2d 831, 833, 353 N.E.2d 793, 795 (1976), although a "malicious" breach could arguably support an award, in view of New York's policy to deter, by punitive damages, "morally culpable" conduct, *Walker v. Sheldon*, 10 N.Y.2d 401, 404, 223 N.Y.S.2d 488, 490, 179 N.E.2d 497, 498 (1961). In the case at bar, Appendagez's conduct, with its antitrust implications, might be so regarded, although cf. *American Electronics, Inc. v. Neptune Meter Co.*, 30 A.D.2d 117, 290 N.Y. S.2d 333 (1st Dept.1968) (action for unfair competition, defendants "wilfully and deliberately engaged in a conspiracy and a course of conduct which violated elementary standards of morality in the business community," but award of punitive damages reversed "since no public right is involved and the underlying private wrong is susceptible of adequate compensation"). In my judgment, the award of treble damages,

now available under the Donnelly Act, furnishes a sufficient specific and general deterrent. Plaintiffs contend that they are entitled to punitive damages on their contract claims and treble damages on their antitrust claims, citing for that proposition *Arnott v. American Oil Co.*, 609 F.2d 873 (8th Cir. 1979). Plaintiffs' reliance on *Arnott* is misplaced; indeed, the Eighth Circuit observed that "[P]unitive and treble damages cannot both be awarded for violation of the antitrust laws," *id.* at p. 888, citing this Court's decision in *Hansen Packing Co. v. Armour Co.*, 16 F.Supp. 784, 788 (S.D.N.Y.1936). While punitive damages were awarded on the breach of contract claims in *Arnott*, treble damages were not available because it did not appear from the jury's verdict whether or not plaintiff recovered on an antitrust theory. I am cited to no case holding that a plaintiff may recover both punitive damages on a contract claim and treble damages on an antitrust claim, where both claims arise out of the same facts. Such piling of Pelion on Ossa appears contrary to the trend of authority, and I decline to do so.

The Donnelly Act also provides for the award of "costs not exceeding ten thousand dollars, and reasonable attorneys' fees." Costs may be taxed in favor of plaintiffs by the Clerk. No proof was offered in respect of attorney's fees, a claim which would have to be analyzed in the light of *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 470–474 (2d Cir. 1974); in consequence no award can be made. If plaintiffs wish to press a claim for attorneys' fees, they may move to amend the judgment to be entered herein, pursuant to Rule 59(e), F.R.Civ.P.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the subject matter and parties to this action.

2. The purchase orders which form the subject matter of this action constituted valid and binding contracts. Defendant has not proved a contrary usage of the trade.

3. Defendant's failure to ship goods in response to those purchase orders constituted breaches of its contractual obligations, and plaintiffs are entitled to recover compensatory damages in respect of those breaches.

4. Defendant's failure to ship the goods covered by the purchase orders constituted action which is forbidden by the Donnelly Act, N.Y. General Business Law § 340, and accordingly plaintiffs are entitled to recover treble damages. Plaintiffs are not entitled to recover punitive damages in addition to treble damages.

The foregoing constitutes the Court's Findings of Fact and Conclusions of Law, pursuant to Rule 52(a), F.R.Civ.P.

The Clerk of the Court is directed to enter judgment against defendant, as follows:

In favor of plaintiff Carl Wagner and Sons, in the amount of $2,573.50, with interest at the rate of 6% per year from January 1, 1977 to the date of judgment, the resulting amount to be multiplied by three, and judgment given accordingly.

In favor of plaintiff Carlson-Scheff Corp., in the amount of $3,994.80, with interest at the rate of 6% per year from January 1, 1977 to the date of judgment, the resulting amount to be multiplied by three, and judgment given accordingly.

In favor of plaintiff Wagner Bros. Haberdashery, Inc., in the amount of $7,890.00, with interest at the rate of 6% per year from January 1, 1977 to the date of judgment, the resulting amount to be multiplied by three and judgment given accordingly.

In favor of plaintiff Carl's in the amount of $2,175.00, with interest at the rate of 6% per year from January 1, 1977 to the date of judgment, the resulting amount to be multiplied by three, and judgment given accordingly.

Plaintiffs may recover the costs of this action, in an amount to be taxed by the Clerk.

It is So Ordered.