OPINION OF THE COURT
Joan B. Lobis, J.
Motion sequence Nos. 001, 002, and 003 are hereby consolidated for disposition. In sequence No. 001, petitioner Andrew M. Cuomo, Attorney General of the State of New York, brings this summary proceeding on behalf of the People of the State of New York against respondent Tempur-Pedic International, Inc., seeking an order and judgment enjoining Tempur-Pedic from *988 engaging in its discounting policy; prohibiting Tempur-Pedic from destroying records; ordering disgorgement of Tempur-Pedic’s profits and restitution to consumers; and awarding costs under CPLR 8303 (a) (6). The Office of the Attorney General (OAG) alleges that Tempur-Pedic has violated General Business Law § 369-a, and that those violations constitute repeated and persistent illegal and fraudulent conduct in violation of Executive Law § 63 (12). In motion sequence No. 002, Tempur-Pedic moves, pursuant to CPLR 404 (a) arid 3211 (a) (3) and (7), for an order and judgment dismissing the petition. In motion sequence No. 003, Tempur-Pedic moves for an order striking portions of the OAG’s petition or granting Tempur-Pedic leave to take discovery of the evidence submitted with the petition.
Tempur-Pedic manufactures viscoelastic memory foam mattresses. Those mattresses are sold directly by Tempur-Pedic and by retailers authorized by Tempur-Pedic to resell its products. Apparently, in February 2007, the OAG received a letter from a member of the public (who asked in his letter that his identity remain confidential), who stated that he had been shopping for a Tempur-Pedic mattress and that a number of stores in New York had informed him that Tempur-Pedic dictates the resellers’ prices for its mattresses and does not allow discounts. The letter stated, “[t]his sounds like illegal price fixing to me.” Based on this singular complaint, the OAG commenced an investigation into Tempur-Pedic’s retail pricing policies, and uncovered what it alleges are illegal and prohibited contracts to fix prices.
Tempur-Pedic has established what it refers to as its Retail Partner Obligations and Advertising Policies (the RPOAP). Retailers agree to abide by the terms in the RPOAP by signing an acknowledgment of receipt. As a Tempur-Pedic retail partner, the retailer must agree to, for example, follow Tempur-Pedic’s rules regarding advertising and brandmark usage; ship only within certain geographic areas; accept Tempur-Pedic’s termination policies; and understand the product and the warranties. The RPOAP sets forth a number of advertising policies to which retailers must adhere. For instance, retailers must have a physical store location; adhere to certain restrictions on Internet sales and advertising; adhere to certain restrictions on the use of coupons, rebates, and promotional items; adhere to certain restrictions on the words, pictures, and brandmarks used in advertising or discussing the product; and adhere to restrictions on the types of media used to communicate advertisements. Certain types of promotions may not be advertised with *989 Tempur-Pedic products, such as advertising a free gift, gift card, rebate, coupon, or store credit with a value of over $100 with the purchase of a Tempur-Pedic product; advertising an offer to pay the amount of the sales tax on a Tempur-Pedic product; advertising an offer to pay the customer for his or her old bedding in conjunction with the purchase of a new Tempur-Pedic product; or advertising a free foundation with the purchase of a Tempur-Pedic product. The RPOAP further states: “[t]hese requirements are the only agreement between you and Tempur-Pedic and supersede and/or replace any other agreements you may have. These requirements cannot be changed orally, but only through writing.” The RPOAP is periodically revised by Tempur-Pedic; the most recent version of the RPOAP is from 2009. The RPOAP does not contain provisions regarding pricing.
In April 2002, Tempur-Pedic established a retail pricing policy. In a one-page memorandum to its retailers, Tempur-Pedic “announce [d] a policy to suspend doing business with any retailer who does not adhere substantially to [its] suggested retail price ranges.” Tempur-Pedic told the retailers that it would suspend shipments to an account if it discovered that the account was substantially deviating from Tempur-Pedic’s suggested retail prices and that the deviation was more than an isolated incident or a liquidation sale of discontinued Tempur-Pedic merchandise. The retailers were informed that the policy is Tempur-Pedic’s unilateral decision; the policy is not negotiable; and that Tempur-Pedic neither seeks nor will it accept its retailers’ agreement with the policy. The retailers were also told that they may set prices at whatever level they believe to be in their best interests. Since the initial announcement of the policy in April 2002, Tempur-Pedic has reaffirmed its pricing policy through written and verbal communications to its retailers. Tempur-Pedic informs its retailers about its suggested retail price ranges by periodically providing retailers with price lists.
During its investigation, the OAG discovered that New York retailers selling Tempur-Pedic mattresses generally comply with Tempur-Pedic’s pricing policies. In response to the OAG’s interrogatories, Tempur-Pedic stated that it was not aware of any New York retailer who had chosen not to “adhere substantially” to its suggested retail price ranges, and that it “interprets ‘adhere substantially,’ in this context to include both a persistent and intentional deviation from suggested retail price ranges.” Various retailers that were subpoenaed by the OAG acknowl *990 edged that they adhere to Tempur-Pedic’s pricing policy. Tempur-Pedic stated that it sometimes receives complaints of underpricing from retailers against other retailers. The OAG submits documents that indicate that Tempur-Pedic contacts retailers to clarify its pricing policy when it believes that the retailer may be violating the policy.
The OAG brings this proceeding under Executive Law § 63 (12). The OAG claims that Tempur-Pedic has demonstrated persistent fraud and illegality by violating General Business Law § 369-a, which sets forth: “[a]ny contract provision that purports to restrain a vendee of a commodity from reselling such commodity at less than the price stipulated by the vendor or producer shall not be enforceable or actionable at law.” Under Executive Law § 63 (12), the Attorney General may apply to the courts for an order enjoining any person from engaging in “repeated fraudulent or illegal acts” or otherwise demonstrating “persistent fraud or illegality” in transacting business.
Tempur-Pedic submits an answer asserting affirmative defenses and also moves to dismiss the petition pursuant to CPLR 404 (a) and 3211 (a) (3) and (7). In the motion to dismiss, Tempur-Pedic first argues that the petition fails to allege any illegal act. Second, Tempur-Pedic argues that the petition fails to allege facts sufficient to demonstrate any fraudulent conduct by Tempur-Pedic. Third, Tempur-Pedic maintains that the OAG has not alleged facts sufficient to establish the existence of a contract provision between Tempur-Pedic and its retailers to set prices. For these reasons, Tempur-Pedic argues that the petition must be denied and the proceeding dismissed in its entirety.
The court evaluates special proceedings under the same standards that apply to summary judgment motions. (People v D.B.M. Intl. Photo Corp., 135 AD2d 353, 354 [1st Dept 1987].) Petitioner must tender evidentiary proof, in admissible form, sufficient to “warrant the court as a matter of law in directing judgment in [his] favor.” (CPLR 3212 [b].) Unsupported allegations or those with insufficient or inadmissible proof will not serve to establish a prima facie case. Only after the petitioner submits evidence establishing its claim does the burden shift to the respondent to come forward with evidence raising a triable issue of fact.
As to whether Tempur-Pedic’s pricing policy is illegal, the OAG maintains that section 369-a of the General Business Law provides that a vendor or producer, such as Tempur-Pedic, cannot prohibit a reseller from discounting its products. The OAG *991 urges that section 369-a’s title, “Price-fixing prohibited,” directly demonstrates the legislative intent to declare contracts to restrain resale pricing illegal. Citing to Carl Wagner & Sons v Appendagez, Inc. (485 F Supp 762 [SD NY 1980]), the OAG maintains that under New York law, a vendor cannot insist that retailers use the prices specified by the vendor or otherwise restrain the reseller’s right to discount the resale price.
Tempur-Pedic argues that the plain language of General Business Law § 369-a does not declare contracts to restrain a vendee from reselling a commodity at less than a price stipulated by the vendor illegal; rather, section 369-a declares those contracts unenforceable. Tempur-Pedic urges the court to construe section 369-a in conjunction with the Donnelly Act (General Business Law § 340 et seq.) and the Sherman Act (15 USC § 1 et seq.). Tempur-Pedic argues that construing section 369-a to outlaw all resale price agreements would bring section 369-a into conflict with the Donnelly and the Sherman Acts, under which such agreements are presumptively legal. Tempur-Pedic argues that declaring resale price agreements illegal in New York under section 369-a would raise issues of fair warning and due process, given that the statute contains no such declaration, the OAG’s prior interpretation of the statute is to the contrary, and the OAG has never before charged anyone with violating the statute.
The court agrees with Tempur-Pedic that the OAG has failed to allege an illegal act. “The statutory text is the clearest indicator of legislative intent and courts should construe unambiguous language to give effect to its plain meaning.” (Matter of DaimlerChrysler Corp. v Spitzer, 7 NY3d 653, 660 [2006] [citations omitted].) While the OAG urges the court to look to the title of the statute and other indicators of the Legislature’s intent to criminalize resale price restraints, when the text is clear, the court’s inquiry into legislative intent ends. (See Squadrito v Griebsch, 1 NY2d 471, 475 [1956] [“While a title or heading may help clarify or point the meaning of an imprecise or dubious provision, it may not alter or limit the effect of unambiguous language in the body of the statute itself’].) There is no ambiguity in the text of General Business Law § 369-a. Contracts for resale price restraints are unenforceable and not actionable, but not illegal.
Further, the court does not find, as the OAG argues, that Carl Wagner & Sons v Appendagez, Inc. (485 F Supp 762 [SD NY 1980]) is controlling on the issue of whether Tempur-Pedic *992 committed an illegal act. In Carl Wagner, a retailer sued a manufacturer for the manufacturer’s failure to fill and ship orders. The court found that the manufacturer had threatened to cut off the retailer’s shipments if the retailer did not adhere to its pricing guidelines. (Id. at 768.) The manufacturer maintained that it had not breached its contractual obligations to fill and ship the retailer’s orders because the retailer’s orders were not binding on the manufacturer until approved by the manufacturer’s home office. The court found that this explanation was a pretext for the real reason that the manufacturer refused to fulfil its contractual obligations, namely, that the retailer refused to adhere to the manufacturer’s pricing guidelines. Thus, the retailer was entitled to recover damages for the manufacturer’s breach. The court’s one reference to General Business Law § 369-a, that, in light of the statute, the manufacturer could not “legally implement” its minimum pricing policy, is not a holding that all such policies are illegal, but that the court would not enforce such a contract.* (Id. at 772.)
Having fallen short of sufficiently alleging an illegal act, the court must determine whether the OAG has sufficiently alleged that Tempur-Pedic’s acts or practices, as described, amount to repeated or persistent fraud. Tempur-Pedic maintains that the OAG has failed to allege that Tempur-Pedic’s acts have had the “capacity or tendency to deceive, or [have] create[d] an atmosphere conducive to fraud.” (People v General Elec. Co., 302 AD2d 314, 314 [1st Dept 2003].) Tempur-Pedic maintains that it operates at face value and that its actions with regard to its policy not to do business with retailers who choose to sell its products below its suggested retail prices are consistent with its words, with no attempts to deceive or mislead.
The OAG maintains that Tempur-Pedic’s restraints on discounting are fraudulent because the company “misleads retailers into believing that restraints on discounting are enforceable, thus ensuring compliance to its demands.” Further, Tempur-Pedic’s pricing restraints deceive customers into believing that the retailer cannot discount Tempur-Pedic products when, in fact, retailers do have that right under law. The OAG also argues that the pricing policy is an unenforceable contract provision. The OAG thus maintains that Tempur-Pedic’s pric *993 ing policy is fraudulent conduct actionable under Executive Law § 63 (12).
For the purposes of Executive Law § 63 (12), the term fraudulent includes “any device, scheme or artifice to defraud and any deception, misrepresentation, concealment, suppression, false pretense, false promise or unconscionable contractual provisions.” The OAG has submitted no evidence to show that retailers were misled or deceived in any way to believe that they had entered into contracts to restrain discounting. The scant evidence submitted by the OAG on this issue, in fact, tends to disprove its argument that retailers were misled. In its interrogatory responses, a retailer identified as Raymour & Flanigan states that it did not make any agreement with Tempur-Pedic on retail prices. Raymour & Flanigan’s senior vice-president of merchandising, Neil Rosenbaum, states in an affidavit that Raymour & Flanigan sells Tempur-Pedic products based on Tempur-Pedic’s policy. A retailer identified as Sleepy’s sets forth that its decision to sell Tempur-Pedic products at suggested retail prices is based on Tempur-Pedic’s unilateral policy. Sleepy’s vice-president of sales, Michael Bookbinder, states in an affidavit that Sleepy’s sells Tempur-Pedic products at suggested retail prices because Tempur-Pedic declines to do business with retailers who charge less. There is no evidence submitted by the OAG that these retailers have been misled to believe that they are bound by an enforceable contract to set retail prices. Further, although the OAG argues that Tempur-Pedic’s pricing restraints deceive customers into believing that a retailer cannot discount Tempur-Pedic products, no evidence was submitted to support this contention.
Moreover, although the OAG argues that it has the power to enjoin unenforceable contract provisions under Executive Law § 63 (12), the OAG has not sufficiently demonstrated the existence of a contract here, which is one of the elements required by General Business Law § 369-a. “In determining whether a contract exists, the inquiry centers upon the parties’ intent to be bound, i.e., whether there was a ‘meeting of the minds’ regarding the material terms of the transaction.” (Amcan Holdings, Inc. v Canadian Imperial Bank of Commerce, 70 AD3d 423, 426 [1st Dept 2010] [some internal quotation marks omitted], quoting Central Fed. Sav. v National Westminster Bank, U.S.A., 176 AD2d 131, 132 [1st Dept 1991].) There is very little case law in New York that deals with General Business Law § 369-a. However, the concept of a “meeting of the minds” with *994 regard to price-fixing allegations was heavily discussed in the United States Supreme Court case of Monsanto Co. v Spray-Rite Service Corp. (465 US 752 [1984]). Although Monsanto deals with the Federal Sherman Act, and not New York law, the case provides some guidance as to the definition of a contract in cases involving allegations of trade restraints and price fixing.
In Monsanto, the Court distinguished between independent action and concerted action. A manufacturer’s independent acts to set minimum resale prices, without seeking agreement from its retailers, do not amount to a contract. (Id. at 761; see also United States v Colgate & Co., 250 US 300, 307 [1919] [reaffirming long-standing right of a private manufacturer to decide with whom he wants to do business and “announce in advance the circumstances under which he will refuse to sell”].) The Monsanto Court further explained:
“the fact that a manufacturer and its distributors are in constant communication about prices and marketing strategy does not alone show that the distributors are not making independent pricing decisions. A manufacturer and its distributors have legitimate reasons to exchange information about the prices and the reception of their products in the market. Moreover, it is precisely in cases in which the manufacturer attempts to further a particular marketing strategy by means of agreements on often costly nonprice restrictions that it will have the most interest in the distributors’ resale prices. The manufacturer often will want to ensure that its distributors earn sufficient profit to pay for programs such as hiring and training additional salesmen or demonstrating the technical features of the product, and will want to see that ‘free-riders’ do not interfere. Thus, the manufacturer’s strongly felt concern about resale prices does not necessarily mean that it has done more than the Colgate doctrine allows.” (465 US at 762-763 [citation omitted].)
Neither will complaints from retailers about other retailers who cut prices, alone, demonstrate that an agreement exists between a manufacturer and its retailers to fix prices. (Id. at 763 n 8.) “[Something more than evidence of complaints is needed.” (Id. at 764.) A party seeking to prove an agreement to fix prices must present evidence that tends to exclude the possibility that the manufacturer and retailers were acting independently, i.e., *995 evidence that the manufacturer and retailers “ ‘had a conscious commitment to a common scheme designed to achieve an unlawful objective.’ ” (Id. [citations omitted].) To show a “meeting of the minds” or a “common scheme,” it must be shown that the retailer “communicated its acquiescence or agreement, and that this was sought by the manufacturer.” (Id. n 9.)
Another instructive case is Isaksen v Vermont Castings, Inc. (825 F2d 1158 [7th Cir 1987], cert denied 486 US 1005 [1988]). In Isaksen, the manufacturer provided retailers with a suggested retail price list and informed them that they could sell at any price they wanted. (Id. at 1162.) The plaintiff retailer sold the product at prices below the suggested retail prices. Competing retailers complained to the manufacturer about the plaintiff. When the manufacturer found out about the plaintiffs discounting, it began to threaten and harass him in a variety of ways. The plaintiff raised his prices in response to threats from the manufacturer that his orders would be mixed up unless he raised his prices. (Id. at 1162-1163.) However, he did not raise his prices until one year after the threats started, and in that year, the manufacturer never carried out its threats to harm the plaintiffs business. (Id. at 1163.) The court posited that merely adhering to suggested retail prices does not establish an agreement to adhere; but, if the manufacturer employs coercive tactics or threats to achieve compliance, a contract may be implicitly formed by “conduct in lieu of promissory language.” (Id. at 1164.) A contract may be formed if a retailer raises his prices in response to a manufacturer’s threats to harm the retailer’s business unless the retailer complies with a list of suggested prices. (Id.)
Turning to the case at hand, the court finds that, even under the rationale in Isaksen, petitioner’s submissions do not sufficiently allege that a contract to fix prices was formed. In the OAG’s papers in support of the petition, there are a number of instances of Tempur-Pedic communicating with its retailers regarding compliance with its set minimum prices, but the communications do not demonstrate the enforcement mechanisms contemplated in Isaksen that might support a finding of a contract. The OAG’s submissions are also insufficient to show that Tempur-Pedic actually cancelled an account with a retailer based on the retailer’s failure to adhere to the pricing policy. Indeed, Tempur-Pedic’s response to the OAG’s interrogatories sets forth that it has never ceased doing business with a New York retailer due to the retailer’s refusal or failure to sell *996 Tempur-Pedic products at retail prices suggested, recommended, or mandated by Tempur-Pedic. One internal Tempur-Pedic e-mail seemed to indicate that Tempur-Pedic was going to terminate one retailer, Dave Hayes Appliance Center, for failure to adhere to the pricing policy, but there are no affidavits from that retailer and no indication that the retailer was ever actually terminated. Petitioner alleges that a second retailer, Dream City Mattress, was also terminated as a Tempur-Pedic retailer, and that upon information and belief, Dream City Mattress was terminated due to discounting. There is no documentation annexed to the petition to support this allegation. The evidence presented by the OAG fails to demonstrate that the interactions between Tempur-Pedic and its retailers amounted to a meeting of the minds or consisted of harassment, threats to harm business, or concerted acts between Tempur-Pedic and its retailers to harass other noncompliant retailers.
The OAG has also alleged that the RPOAP violates General Business Law § 369-a, because it contains contractual provisions that prohibit and restrain discounting. Tempur-Pedic acknowledges that the RPOAP is an agreement between itself and the retailers, so for the purposes of this motion, the court will consider the RPOAP to be a contract. To be clear, as was explained supra, the RPOAP restrains the retailer from advertising certain coupons, rebates, and promotional items. It does not appear that the RPOAP prohibits dealers from providing coupons, rebates, or promotional items to the customer, but by accepting the terms of the RPOAI^ the dealer does agree not to advertise these items in conjunction with Tempur-Pedic products. Read plainly, the RPOAP is not a contract to restrain discounting, only advertising of discounting.
While the OAG maintains that the RPOAP’s termination language specifically incorporates Tempur-Pedic’s pricing policy, and that Tempur-Pedic achieves compliance with the pricing policy due to the contract it has with its retailers in the RPOAR the evidence submitted by the OAG does not support this allegation. The RPOAP does require the retailer to “agree to abide by” and “Accept Tempur-Pedic Retail Partner Termination Policies.” The OAG alleges that the RPOAP is provided to Tempur-Pedic’s retailers with a “cover letter” explaining Tempur-Pedic’s retail pricing policy and Tempur-Pedic’s intentions to cease doing business with any retailer that charges less than Tempur-Pedic’s suggested retail prices. The OAG essentially asks the court to consider the two documents as the complete contract, *997 into which retailers enter by signing the acknowledgment of receipt of the RPOAE This claim that the RPOAP and the “cover letter” should be considered one contract is flawed. First, the OAG’s submissions do not sufficiently support its claim that the documents are provided together. Second, Tempur-Pedic set forth that it carries out its pricing policy even if a retailer does not agree to be bound by the RPOAE Third, the language in the RPOAP states that the RPOAP is “the only agreement between [retailers] and Tempur-Pedic.” It is well settled that a “contract is to be construed in accordance with the parties’ intent, which is generally discerned from the four corners of the document itself. Consequently, a written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms.” (IDT Corp. v Tyco Group, S.A.R.L., 13 NY3d 209, 214 [2009] [internal quotation marks omitted].) There is no indication that the parties intended to incorporate the pricing policy into the RPOAP. Tellingly, the retailers themselves, when questioned by the OAG, denied the existence of a contract between themselves and Tempur-Pedic to adhere to Tempur-Pedic’s pricing guidelines. The evidence submitted by the OAG indicates that the retailers understand that they are not contractually bound to adhere to Tempur-Pedic’s minimum suggested retail prices, but that not doing so may negatively affect their standing as a Tempur-Pedic product retailer. Without demonstrating, by some evidence, that a contract to adhere to suggested minimum resale prices or prohibit discounting exists, the OAG’s petition falls short of pleading all of the elements required to show a violation of General Business Law § 369-a. Even accepting the OAG’s argument that it has the power to seek to enjoin parties from imposing unenforceable contract provisions, as it asserts, no contract provision to restrain discounting has been established herein.
The court need not reach the remainder of the issues herein. Accordingly, it is hereby ordered and adjudged that the motion to dismiss (motion sequence No. 002) is granted, the motion to strike (motion sequence No. 003) is denied as moot, the petition (motion sequence No. 001) is denied, and the proceeding is dismissed.

 In Carl Wagner, the court went on to award treble damages in favor of the plaintiff retailer under the Donnelly Act. In this case, the OAG stated at oral argument that it was not asserting that Tempur-Pedic had committed any violations of the Donnelly Act.