E.F. HUTTON GROUP, INC. and E.F. Hutton & Co., Inc., Plaintiffs,

v.

UNITED STATES POSTAL SERVICE, Wall Street Mail Pickup Service, Inc., and A–Mark Precious Metals, Inc., Defendants.

No. 86 Civ. 9766 (CHT).

United States District Court, S.D. New York.

March 2, 1989.

Joseph D'Elia (George W. Clarke, of counsel), Huntington, N.Y., for plaintiffs.

Rudolph W. Guliani, U.S. Atty., S.D.N.Y. (Helen M. Toor, Nancy G. Milburn, Asst. U.S. Attys.), New York City, for defendant U.S. Postal Service.

Timothy W. Sullivan, Garden City, N.Y., for defendant Wall Street Mail Pickup Service, Inc.

## OPINION

TENNEY, District Judge.

Plaintiffs E.F. Hutton Group, Inc. ("Hutton Group"), and E.F. Hutton & Co., Inc. ("Hutton & Co."), (collectively "Hutton"), bring this action against the United States Postal Service (the "Postal Service") and

Wall Street Mail Pickup Service, Inc. ("Wall Street") alleging that defendants misdelivered and caused the loss of two shipments of gold coins to Hutton from defendant A–Mark Precious Metals, Inc. ("A–Mark"). This court has jurisdiction over these claims pursuant to 39 U.S.C. § 409(a) (1983) and 28 U.S.C. § 1339 (1983). By stipulation of the parties, the action, as it pertained to defendant A–Mark, was discontinued with prejudice on November 14, 1988. Pursuant to 28 U.S.C. § 2402 (1983), the remaining causes of action were tried by the court without a jury from November 16 until November 22, 1988.

For the reasons hereinafter set forth, I find that plaintiffs have failed to prove by a preponderance of the credible evidence that the Postal Service was legally responsible for the loss of the gold coins and further find that the loss was equally caused by Hutton's own negligence and that of Wall Street.

The following, including those additional facts referred to in the Discussion, constitutes the court's findings of fact and conclusions of law on the issue of liability pursuant to Fed.R.Civ.P. 52(a).

## FINDINGS OF FACT

### A. *The Parties*

1. At all relevant times, Hutton Group was a corporation organized under the laws of the State of Delaware with an office for the conduct of its business at 26 Broadway, 10th Floor, New York, New York. Stipulated Fact 1.

2. At all relevant times, Hutton & Co. was a corporation organized under the laws of the State of Delaware, with an office and principal place of business at One Battery Park Plaza, New York, New York. Stipulated Fact 4.

3. At all relevant times, Hutton & Co. also maintained offices, on various floors, at 26 Broadway, New York, New York. Stipulated Fact 5.

4. At all relevant times, Wall Street was a domestic corporation with an office and principal place of business at 22 Renwick Street, New York, New York. Stipulated Fact 8.

5. The Postal Service is an independent establishment of the executive branch of the United States government. Stipulated Fact 6.

6. At all relevant times, the Postal Service maintained a post office station at Bowling Green, New York, New York, which was located at 25 Broadway, directly across the street from Hutton's offices at 26 Broadway. Stipulated Facts 3, 7.

7. At all relevant times, Wall Street was engaged, *inter alia*, in the business of collecting certain kinds of mail addressed to its customers at various post offices maintained by the Postal Service, and delivering such mail by truck to its customers. Stipulated Fact 9; *see* Trial Transcript ("Tr.") at 127, 169.

8. At all relevant times, A–Mark was a business with an office and principal place of business at 9696 Wilshire Boulevard, Beverly Hills, California. Stipulated Fact 10.

9. At all relevant times, A–Mark was engaged, *inter alia*, in the business of trading, marketing, shipping and selling precious or semi-numismatic coins. Stipulated Fact 11.

### B. *The Hutton Mailroom*

10. Neither the Postal Service nor Wall Street differentiated between Hutton Group and Hutton & Co. Mail for both Hutton Group and Hutton & Co. offices at 26 Broadway was accepted at the Hutton mailroom at 26 Broadway and the procedures for accepting delivery of mail for both Hutton Group and Hutton & Co. at the Hutton mailroom were identical. *See* Tr. at 34–35, 101–02, 105, 160, 218, 282.

11. Whether addressed to specific individuals at Hutton or simply to Hutton itself, all mail first passed through the mailroom. It was then delivered internally by mailroom employees. Tr. at 105.

12. "Accountable mail" is any mail for which the signature of a recipient must be obtained at the time of delivery, including registered mail. Stipulated Fact 34.

13. When an employee of Hutton's mailroom personally received accountable mail,

he or she entered it into a logbook maintained for that purpose in the Hutton mailroom. Tr. at 73, 138.

14. The accountable mail logbook identified each piece of accountable mail by post office registry or certification number, date of receipt and signature of the Hutton employee who ultimately received the package from the mailroom employee. Tr. at 73, 138; see Tr. at 171.

## C. Wall Street's Authorization to Accept Delivery of Hutton's Accountable Mail from the Postal Service

15. Wall Street had been picking up mail for Hutton at the Bowling Green branch every day for at least eleven years prior to the occurrence of the incidents underlying this lawsuit. Tr. at 115–16.

16. Wall Street's typical daily procedure was to pick up Hutton's mail at the loading dock of the Bowling Green station. Wall Street would normally bring the mail from the Bowling Green station in sacks that it would deliver to employees in the Hutton mailroom. Tr. at 204, 407–08.

17. There was no written agreement between Hutton and Wall Street defining Wall Street's duties or responsibilities and there were never any discussions between the two regarding whether Hutton wanted Wall Street to pick up accountable mail for Hutton at the Bowling Green Branch. Tr. at 73, 95, 96, 97, 121, 173, 186.

18. Until the investigation into the disappearance of the gold coins, there were never any discussions between the Postal Service and Wall Street regarding any authorization for Wall Street to pick up accountable mail for Hutton at the Bowling Green Branch. Tr. at 214, 473–74.

19. During the period relevant to this lawsuit, the Hutton mailroom was sometimes closed to permit mailroom employees to pick up and distribute mail throughout Hutton's offices at 26 Broadway. In such cases the door to the mailroom was closed and locked. If this is what Wall Street employees found when they arrived with a delivery, they left the mail bags in a hallway outside the door to the Hutton mailroom. The hallway was accessible to non-mailroom Hutton employees. Hutton mailroom employees told Wall Street that this procedure was acceptable. Tr. at 104–05, 137, 156–57, 421–22.

20. In late 1985, a postal carrier informed Stephen Brophy, Hutton's Assistant Vice-president and National Product Manager of Precious Metals, that he was having trouble making deliveries to Hutton's mailroom and also told Mr. Brophy that he could deliver registered packages only to the Hutton mailroom because he was not authorized to deliver such packages for Hutton to more than one location at 26 Broadway. Tr. at 6, 36–37.

21. On December 17, 1985, Salvatore J. Stabile, Vice President of E.F. Hutton & Co., wrote to the Postmaster of the Bowling Green Station as follows:

Dear Sirs:

This letter will serve as authorization for Wall St. Mail Pickup Service to collect all mail addressed to E.F. Hutton & Co., Inc, 26 Broadway which is currently being held at your facility.

Thank you for your cooperation in this matter.

Salvatore J. Stabile
Vice President

Plaintiffs' Exhibit ("Pl.Exh.") 10; Stipulated Fact 31.

22. Mr. Stabile cannot now recall why he wrote the December 17 letter and Hutton did not send a copy of the letter to Wall Street. Tr. at 83, 93, 124, 471.

23. Allen Bernstein, a Tour Supervisor at the Bowling Green Station, received the letter and interpreted the phrase "all mail" to include accountable mail. Tr. at 207.

24. Postal Regulations permit addressees to designate others to receive their mail with a letter of authorization to the Postal Service. The Bowling Green station properly released accountable mail to third parties when presented with such letters. Mr. Bernstein accepted the December 17 letter as authorization to follow the above procedures. Tr. at 204, 253–54.

25. Mr. Bernstein copied and distributed the letter from Mr. Stabile to various sec-

tions of the Bowling Green station, including the Registry Cage, the area in which registered mail was processed. Tr. at 209.

26. Pursuant to the letter as he interpreted it, Bernstein instructed the Registry Cage employees to provide all of Hutton's registered mail for the 26 Broadway offices to Wall Street. Tr. at 209–10.

27. Under this procedure, Postal employees retrieved registered mail for Hutton's 26 Broadway offices at the Registry Cage and provided it, along with Hutton's non-accountable mail, to Wall Street employees when they arrived at the Bowling Green station loading dock for their daily pick up. The Wall Street employee would sign a document indicating receipt of each specific registered item and put the item in Wall Street's truck along with the non-accountable mail. Tr. at 210, 282–85, 346–61, 395–96, 416.

28. This was a novel procedure for releasing accountable mail at the Bowling Green station but it continued for several months following Bernstein's receipt of the December 17 letter. Tr. at 211, 349–50, 356.

29. If the accountable items were small enough, the Wall Street employee would place them in a mail sack containing Hutton's non-accountable mail, which he would subsequently deliver to the Hutton mailroom. A Hutton mailroom employee would sign a receipt indicating receipt of a mail sack but would not open the sack in the presence of the Wall Street employee or sign anything indicating receipt of accountable mail. Tr. at 416–19.

30. In addition to the two parcels involved in this lawsuit, Wall Street signed for at least sixteen other pieces of accountable mail under this procedure, which it accepted and delivered without incident to Hutton's mailroom at 26 Broadway. All of these items were successfully delivered by

Hutton employees to the responsible individuals at Hutton. *See* Tr. at 100, 210–12.

31. During this time period, a Wall Street supervisor signed for accountable mail on behalf of Hutton on at least one occasion. Tr. at 424, 426; Postal Service. Exh. I.

32. Prior to the occurrence of the incidents underlying this lawsuit, Hutton management was probably on notice that the Hutton mailroom occasionally found accountable mail in mailbags delivered by Wall Street. Tr. at 100.[1]

33. Until these losses occurred, Hutton never told anyone at the Bowling Green station not to deliver accountable mail to Wall Street employees. Tr. at 97.

34. Prior to the investigation into the disappearance of the coins underlying this lawsuit, the Postal Service did not receive any complaints from Hutton about non-delivery of accountable mail and did not receive any complaints from Wall Street about the Postal Service's practice of providing accountable mail to Wall Street. Similarly, Hutton never complained to Wall Street or the Postal Service about accountable mail for Hutton being delivered in the bags that Wall Street brought to 26 Broadway. Tr. at 129, 210–12, 431.

35. After the occurrence of these incidents, Hutton and the Postal Service changed their procedures so that accountable mail was no longer processed through the Hutton mailroom but was delivered by the Postal Service directly to the relevant Hutton department. Tr. at 151.

### D. *The Shipments in this Case*

36. On January 29, 1986, an employee of Hutton Group ordered fifty-five "about circulated" $20.00 U.S. Liberty gold coins from A–Mark, for a total price of $28,050. Stipulated Fact 12.

---

1. The mailroom clerk most involved with accountable mail testified that he never told any supervisor that he had found such mail in the sacks delivered by Wall Street, Tr. at 159, but he conceded that Salvatore Stabile, a Hutton vice-president, had asked him what he would do if he found accountable packages inside such bags. *Id.* Mr. Stabile testified that this clerk had told him that he occasionally found accountable packages in Wall Street's sacks. Tr. at 100. It is not clear from his testimony that this conversation took place before these losses occurred but it appears from the context of the questioning that it did.

37. A–Mark and Hutton Group agreed that A–Mark would ship the coins by registered mail, with postal insurance to be secured from the Postal Service. Stipulated Fact 17.

38. On or about January 30, 1986, A–Mark delivered a parcel containing these coins to the Beverly Hills, California, station of the Postal Service. Stipulated Fact 18.

39. The parcel was addressed as follows:

MR. STEPHEN BROPHY
NATIONAL PRODUCT MANAGER
THE EF HUTTON GROUP, INC.
26 BROADWAY # 1001
NEW YORK NY 10004

*See* Stipulated Fact 13; Pl. Exh. 2; Tr. at 20 (stipulation of counsel for the Postal Service).

40. At that time, A–Mark paid postage to the Postal Service to send the parcel by registered mail. The parcel was identified by registration number 266–002–959. Stipulated Fact 19.

41. A–Mark purchased from the Postal Service postal insurance in the amount of $25,000 for the parcel. A–Mark paid the Postal Service $13.65 based upon A–Mark's declaration of value for the parcel in the amount of $28,050. Stipulated Fact 20.

42. On January 31, 1986, an employee of Hutton Group ordered an additional fifty "about circulated" $20.00 U.S. Liberty gold coins from A–Mark, for a total price of $25,250. Stipulated Fact 21; Pl. Exh. 5.

43. On or about January 30, 1986, A–Mark delivered a parcel containing these coins to the Beverly Hills, California, station of the Postal Service. Stipulated Fact 21.

44. The parcel was addressed as follows:

MR. STEPHEN BROPHY
NATIONAL PROD. MANAGER
THE EF HUTTON GROUP
26 BROADWAY # 1001
NEW YORK NY 10004

*See* Stipulated Fact 16; Pl. Exh. 5; Tr. at 20 (stipulation of counsel for the Postal Service).

45. At that time, A–Mark paid postage to the Postal Service to send the parcel by registered mail. The parcel was identified by registration number 244–515–023. Stipulated Fact 22.

46. A–Mark again purchased from the Postal Service postal insurance in the amount of $25,000 for the parcel. A–Mark paid the Postal Service $12.90 based upon A–Mark's declaration of value for the parcel in the amount of $25,250. Stipulated Fact 23.

47. "Restricted delivery" is a service offered by the Postal Service in which the sender of, *inter alia*, a registered parcel may specify that it be delivered only to a particular individual. United States Postal Service Domestic Mail Manual, Issue 24, September 20, 1987, §§ 911.43, 933.1 (Pl. Exh. 1) ("DMM").

48. The restricted delivery option was available for the registered shipments of these two parcels of coins at an additional cost but Hutton did not ask A–Mark to send the packages restricted delivery. A–Mark did not request the Postal Service to send the parcels restricted delivery when it mailed the parcels. Tr. at 40; Pl. Exhs. 8A, 8B.

49. Both parcels of coins were timely delivered to the Bowling Green station of the Postal Service. On February 3, 1986, Postal Service employees at the Bowling Green station provided parcel number 266–002–959 containing fifty-five gold coins to John Gaillard, an employee of Wall Street, when he arrived to pick up mail for Hutton. On February 6, 1986, Postal Service employees similarly provided parcel number 244–515–023, containing fifty gold coins, to Mr. Gaillard. *See* Stipulated Facts 28–30; Pl. Exhs. 8A, 8B.

50. Although Wall Street claimed to have trained its drivers not to sign for or accept anything of value, Mr. Gaillard testified that he was never trained or instructed by his superiors not to accept accountable mail from the Postal Service. On each of the two occasions that Mr. Gaillard re-

ceived a parcel of coins, he signed a Postal Service form indicating his personal receipt of the particular parcel. *See* Tr. at 429–30, 461; Pl. Exhs. 8A, 8B.

51. The parcels disappeared after being given to Mr. Gaillard and there is no indication in the records of the Hutton mailroom that they were ever received by an employee of the Hutton mailroom. *See* Tr. at 152–53; Stipulated Fact 35.

52. Hutton initiated a timely investigation with the Postal Service to try to determine what had happened to the parcels but they could be traced only as far as their delivery to Mr. Gaillard. Stipulated Fact 26.

53. Hutton, as addressee, and A–Mark, as sender, presented timely claims to the Postal Service under the postal insurance for the alleged loss of both parcels. The Postal Service denied the claims. Stipulated Facts 36–37.

54. Hutton has paid A–Mark for the gold coins and A–Mark has assigned to Hutton its rights under the insurance agreements with the Postal Service. Stipulated Facts 24, 25; Attachment to Stipulation and Order of Discontinuance, dated November 14, 1988.

55. Hutton timely commenced this action against the defendants. Stipulated Fact 39.

## DISCUSSION

The Postal Service's Domestic Mail Manual states that registered mail is "the most secure service the Postal Service offers." DMM § 911.11. Among other features, registered mail incorporates a system of receipts to monitor the mail's movement from the point of acceptance to delivery. *Id.* Nevertheless, the mere fact that the Postal Service at one point provided a high degree of security for a piece of registered mail does not make it into a permanent guarantor. As the DMM cautions, "[t]he responsibility of the Postal Service for registered mail ends with its proper delivery." *Id.* § 911.41 (emphasis added). The primary issue in this case is whether presentation of the parcels of coins to Wall Street

constituted "proper delivery" so as to relieve the Postal Service of any liability for their eventual loss. For the reasons stated below, I find that it did. Accordingly, I have concluded that the Postal Service has no liability in this case. I have determined that it was the combined negligence of Wall Street and Hutton that caused the loss. Therefore, I have found Wall Street liable for fifty percent of the cost of the coins.

### A. *Claims Against the Postal Service*

■ Hutton's amended complaint asserts claims against the Postal Service on theories of negligence, amended complaint ¶ 6–22, and contract, *id.* ¶ 23–33. The court, however, has no subject matter jurisdiction over the negligence claim. The United States, as a sovereign, is "immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit." *Lehman v. Nakshian*, 453 U.S. 156, 160, 101 S.Ct. 2698, 2701, 69 L.Ed.2d 548 (1981). The only possible source for a negligence claim against the Postal Service, the Federal Tort Claims Act, expressly retains sovereign immunity for "[a]ny claim arising out of the loss, miscarriage, or negligent transmission of letters or postal matter." 28 U.S.C. § 2680(b). Accordingly, to the extent that it asserts a cause of action for negligence against the Postal Service, plaintiffs' complaint must be dismissed. *See Anderson v. United States Postal Service*, 761 F.2d 527, 528 (9th Cir.1985); *Insurance Company of North America v. United States Postal Service*, 675 F.2d 756, 758–59 (5th Cir.1982); *Marine Insurance Co. v. United States*, 378 F.2d 812 (2d Cir.), *cert. denied*, 389 U.S. 953, 88 S.Ct. 335, 19 L.Ed.2d 361 (1967); *Allied Coin Investment, Inc. v. United States Postal Service*, 673 F.Supp. 982, 986 (D.Minn.1987); *see also* Tr. at 498 (counsel for Hutton states that "[t]his is not a claim for negligence").

Plaintiffs' other cause of action is based on the terms of a contract arising between the Postal Service and Hutton as third-party beneficiary or assignee of postal insurance originally purchased by A–Mark. The

terms of the insurance provided by the Postal Service, and the extent of its liability for such insurance, are defined exclusively by the provisions of the DMM, which have the force of federal regulations. *See* 39 C.F.R. § 111.1 (1988); *Marine Insurance Co. v. United States*, 410 F.2d 764, 766 (Ct.Cl.1969); *Allied Coin Inv., Inc. v. United States Postal Service*, 673 F.Supp. 982, 986–87 (D.Minn.1987); *Frank Mastoloni & Sons v. United States Postal Service*, 546 F.Supp. 415, 416 (S.D.N.Y.1982). The DMM provides, in relevant part, that payment for claims on insurance contracts for registered mail "will not be made ... [if the] [l]oss ... occurred after delivery by the Postal Service ... [or] after the article had been transported outside of the mail by other carriers or by private conveyance." DMM § 149.252(d), (q).

Absent special instructions by the addressor or addressee, the point at which a "delivery" occurs is determined by the DMM. Mail addressed to businesses often includes the name of a specific individual. The Postal Service, however, could not possibly keep track of the specific location in a business of individuals who receive mail through the business. *See Quincy Mutual Fire Ins. Co. v. United States Postal Service*, Civ. No. H–83–7364, slip op. at 5 (S.D. Tex. Nov. 8, 1988). Accordingly, the DMM permits the Postal Service to deliver mail addressed to employees at businesses to the mailroom of the organization for further internal distribution. *See* DMM § 153.41–.42; *Quincy Mutual*, slip op. at 5. The parcels in this case were addressed to Stephen Brophy in his corporate capacity. Therefore, under the DMM, the Postal Service could properly have left the parcels with employees of the Hutton mailroom.

Under the DMM, both the addressee and addressor may exercise some control over how mail is to be delivered to the addressee. The DMM expressly provides that "[a] person or a number of persons may designate another to receive their mail." DMM § 153.211. It explains that "[d]esignation of another person to receive mail should be in writing, but no special form is furnished or required." *Id.* These provisions are applicable to registered mail. *Id.* § 911.41. A person sending registered mail might not know what arrangements the addressee has made for delivery of mail or how secure those arrangements are. Therefore, an addressee's instructions may be overridden by an addressor's. Addressors who wish to maintain the highest degree of control and security may elect to purchase the Postal Service's optional restricted delivery service, which directs the Postal Service to deliver a registered parcel only to an individual specifically designated by the customer. *Id.* §§ 911.43, 933.1.[2] A–Mark could have requested restricted delivery for the parcels in this case but did not. The Postal Service was thus entitled to deliver them to Hutton's mailroom or to any other person designated by Hutton to receive Hutton's mail.

■ The crucial question is whether Hutton ever "authorized" Wall Street to accept delivery of Hutton's accountable mail. For the reasons set forth below, I find that they did. The evolution of that authorization occurred over a period of one and one-half months, beginning with the December 17 letter. The letter directed the Postal Service to give "all" of Hutton's mail to Wall Street. *See* Pl. Exh. 10. The Postal Service reasonably took the phrase "all mail" at face value, interpreting it to include accountable mail. Hutton insists, however, that the scope of the letter was more limited. It asserts that it was never intended to authorize the Postal Service to release more than Hutton's ordinary mail to Wall Street. *See* Tr. at 489–91. I cannot contemplate a more strained interpretation of "all mail" than that urged by Hutton. All mail means all mail unless it is qualified in some way. It certainly is not qualified in the letter and there was no extrinsic evidence introduced at trial that

---

**2.** The section of the DMM concerning insured mail itself states that while "[i]nsured mail provides indemnity coverage for an article which is lost ... [,] restricted delivery service[ ] [is] available upon payment of the prescribed fee[ ]." *Id.* § 913.11.

would have limited its scope.[3] Therefore, relying on the four corners of the document, I must conclude that it was reasonable for the Postal Service to interpret "all mail" to include accountable mail.

Hutton also notes that the letter referred only to mail "currently being held" at the Bowling Green Station, arguing that even if the letter had authorized release of accountable mail to Wall Street, the authorization should not have been interpreted to apply to pieces received by the Postal Service subsequent to the date of the letter. *See* Tr. at 489–91. As Hutton asserts, the phrase "currently being held" might have meant mail being held at the Bowling Green station on the date of the letter but that interpretation is only one possibility. It might also have meant registered mail that the Postal Service was in the continuing practice of "holding" at the registry cage because of ongoing difficulties in deliveries of registered mail to the Hutton mailroom. Neither of these interpretations is entirely satisfying. The point is that the Postal Service did not draft the letter, Hutton did. If Hutton wished to limit Wall Street's authorization it should have done so clearly. That intent was never manifested in the letter and was never communicated to the Postal Service. Therefore, it has no significance. *See Carl Wagner & Sons v. Appendagez, Inc.*, 485 F.Supp. 762, 770 (S.D.N.Y.1980).

■ Objectively, the letter created the opposite impression—that Wall Street had an unqualified authorization to accept delivery of all of Hutton's mail. Under the doctrine of apparent authority, if the words or conduct of a principal, communicated to a third party, give rise to the reasonable belief that an agent has authority, apparent authority is created. *Hallock v. New York*, 64 N.Y.2d 224, 231, 485 N.Y.S.2d 510, 513, 474 N.E.2d 1178 (1984). As the court stated in *Masuda v. Kawasaki Dockyard Co.*, 328 F.2d 662, 664–65 (2d Cir. 1964):

Apparent authority is based on the principle of estoppel. It arises when a principal places an agent in a position where it appears that the agent has certain powers which he may or may not possess. If a third person holds the reasonable belief that the agent was acting within the scope of this authority and changes his position in reliance on the agent's act, the principal is estopped to deny that the agent's act was not authorized.

*Accord King World Prod. v. Financial News Network*, 660 F.Supp. 1381, 1385 (S.D.N.Y.), *aff'd*, 834 F.2d 267 (2d Cir.1987). Hutton's December 17 letter led the Postal Service to believe that it should release accountable mail to Wall Street. It was sufficiently ambiguous to warrant application of the apparent authority doctrine.

In addition to the specific language of the letter, other factors support Bernstein's interpretation. The person who drafted the letter, Mr. Stabile, was a vice-president in charge of Hutton's mail facilities. *See* Tr. at 62–63. Whatever his objectives, they were not adequately expressed in the letter. Perhaps no witness established this at trial more convincingly than Mr. Stabile himself. While he was on the stand he admitted that he could not remember why he had drafted the letter. But he also testified that even when he read the letter in court, he could not discern his original objective. *See* Tr. at 83, 93. In all likelihood, Mr. Stabile simply neglected to consider the possibility that it might be construed to include accountable mail; with his experience, he should have realized that danger. Whether Bernstein actually knew of Stabile's experience is not terribly important. The fact is that Stabile was a high-level manager, whose letter Bernstein was entitled to accept at face value.[4]

**3.** There were suggestions by Hutton that the letter was written merely to clear up some confusion resulting from a change in procedures regarding mail for Hutton's 26 Broadway offices, the implication being that this had caused a temporary backup of mail in the Bowling Green station. *See* Tr. at 167, 490. None of the witnesses who should have been able to confirm this as the basis for the letter could do so at trial, however. *See* Tr. at 89, 93, 180–81.

**4.** Mr. Bernstein testified that he followed up his receipt of the letter with a phone call to an unidentified person at Hutton, who confirmed

Even with the benefit of hindsight, no one knows what Mr. Stabile's letter was intended to accomplish. Whatever that was, it should have been stated clearly. Instead, Mr. Stabile drafted an unenlightening and terse communication setting forth the minimum necessary to provide Wall Street with a blanket authorization to accept delivery of all Hutton's mail. Since the letter was drafted by Hutton, it must bear the responsibility for its ambiguities. *See Westchester Resco Co. v. New England Reinsurance Corp.* 818 F.2d 2, 3 (2d Cir.1987); *Jacobson v. Sassower,* 66 N.Y.2d 991, 993, 499 N.Y.S.2d 381, 382, 489 N.E.2d 1283, 1284 (1985). In short, the letter looked like no more than a form authorization, not a response to a particular condition. Had Mr. Stabile added only a few more words to the letter's cryptic instructions, Hutton might have avoided these losses.[5] Under these circumstances, Bernstein's interpretation could arguably be termed reasonable.

Fortunately, I need not rest my decision only on the reasonableness of the Postal Service's actions as of December 17. Even if the initial interpretation had not been reasonable, it is only one factor in determining whether the releases of registered mail to Wall Street on February 3 and February 6 were justifiable. From December 1985 until late February 1986 Wall Street employees—including a Wall Street supervisor on one occasion—signed for at least sixteen other pieces of accountable mail, mixing some with ordinary mail in sacks that were delivered to Hutton's mailroom. Employees of Hutton's mailroom found them but did not raise any objections. These pieces were in turn delivered without incident by Hutton employees to other Hutton employees expecting their delivery. There was evidence that Hutton

management may have become aware of Wall Street's practices yet, until the loss of the two parcels of coins, none of the responsible individuals at Hutton complained about them.

Hutton's acquiescence in procedures that proved to be unreasonably risky is a very significant factor in the court's analysis. Senior personnel who were purportedly in charge of Hutton's mailroom either failed to recognize the dangers inherent in these procedures or, even though they realized the risks, did not bother to put a stop to them. If there had been any uncertainty about the scope of Hutton's authorization to release its mail to Wall Street on December 17, it was resolved by Hutton's subsequent conduct or, more accurately, by its negligent failure to act. Hutton thus ratified the procedures and the Postal Service cannot be faulted for following its customer's implicit directions. *See First City Federal Savings Bank v. Dennis,* 680 F.Supp. 579, 585 (S.D.N.Y.1988); *Harlem River Consumers Cooperative, Inc. v. Assoc. Grocers of Harlem, Inc.,* 408 F.Supp. 1251, 1273 (S.D.N.Y.1976); *Julien J. Studley, Inc. v. Gulf Oil Corp.,* 282 F.Supp. 748, 752 (S.D.N.Y.1968), *rev'd on other grounds,* 407 F.2d 521 (2d Cir.1969); *J.M. Heinike Assoc., Inc. v. Chili Lumber Co.,* 83 A.D.2d 751, 752, 443 N.Y.S.2d 512, 513 (4th Dep't 1981); *Application of Lester,* 87 Misc.2d 717, 723–24, 386 N.Y.S.2d 509, 514 (N.Y.Sup.Ct.1976); *see also Harlem River Consumers Cooperative,* 408 F.Supp. at 1273 (stating that "[a] principal may be found to have ratified or affirmed unauthorized actions of an agent by acceptance of the benefits flowing from those actions").

Hutton contends that no type of authorization, unless it had been submitted on a Postal Service document, Form 1583,

---

that Bernstein was to follow the procedures ultimately adopted by the Postal Service. Tr. at 208–09. I do not credit that testimony.

5. In fact, earlier in the same month, Hutton had sent another, more explicit, authorization letter concerning Wall Street to the Postal Service. In contrast to the carelessly drafted December 17 letter, this correspondence specifically identified two post office boxes from which Hutton was authorizing Wall Street to collect mail. *See*

Postal Serv.Exh.D. It also set forth an explanation for the change in Wall Street's duties. A subsequent letter from Mr. Stabile—received by the Postal Service during the period in which Wall Street was accepting Hutton's accountable mail—also provided an explanation of the reason for that change in Wall Street's duties. Therefore, Hutton was normally more precise in its communications to the Postal Service.

should have been accepted by the Postal Service as authorization for Wall Street to pick up Hutton's accountable mail. Section 153.212 of the DMM, however, states that Form 1583 must be filed with the Postal Service before it will deliver mail to a "mail receiving agency." DMM § 153.212. Unlike delivery services such as Wall Street, a "mail receiving agency" is an entity that receives mail at one address on behalf of customers who wish to use as their mailing addresses the more prestigious address of the mail receiving agency. After delivery, the mail receiving agency forwards the mail to the customer. DMM § 153.212; Tr. at 215; *see, e.g., Kuzma v. United States Postal Service*, 798 F.2d 29, 30 (2d Cir. 1986), *cert. denied*, 479 U.S. 1043, 107 S.Ct. 906, 93 L.Ed.2d 856 (1987); *Shane v. Dillon*, 658 F.Supp. 908, 909 (D.Utah 1985), *aff'd*, 817 F.2d 87 (10th Cir.1987). In contrast, services such as Wall Street simply transport mail from a postal facility directly to its customers. *See* Tr. at 481.

The inapplicability of Form 1583 is evident from an examination of the form itself. Although it also creates a useful written record of the authorization, Form 1583 is essentially a contract in which the mail receiving agency and the ultimate addressee agree to certain terms specified by the Postal Service in consideration for the Postal Service's agreement to deliver the addressee's mail to the agency. For example, the form requires the mail receiving agency and the addressee to agree not to file change of address orders if the agency relationship is terminated. It also requires them to acknowledge that the forwarding of mail intended for the addressee is the responsibility of the agent and sets forth an acknowledgment that new postage will be required of mail forwarded to the addressee by the mail receiving agency. *See* Wall Street Exh. A; DMM § 153.212(a)-(c). These do not apply to trucking services such as Wall Street, so section 153.212 and Form 1583 are inapplicable.

■ Plaintiffs similarly relied on a second document, Form 3801, which they claimed the Postal Service should have demanded before releasing accountable mail

to Wall Street. *See* Pl. Exh. 7; Tr. at 491. They cite no authority for the proposition that Form 3801, entitled "Standing Delivery Order," was required to be used either by the Postal Service or, for that matter, Hutton itself. Since the DMM states that no special form is required for third-party authorizations to receive mail, Form 3801 is no more than a recommended instrument. *See* DMM § 153.211. Even for restricted delivery items, the DMM states that "[a]ddressees who regularly receive restricted delivery mail *may* authorize an agent by use of Form 3801, Standing Delivery Order, or *by a letter* to the postmaster." *Id.* § 933.42.a (emphasis added). Since use of the form is merely optional, plaintiffs' argument has no merit.

■ Hutton raises two other unpersuasive arguments to support its claim that the Postal Service should be liable for these losses. It asserts that the Postal Service violated oral instructions given it by Stephen Brophy, the Hutton employee to whom the parcels of coins were sent, which directed it to deliver to Brophy personally registered packages that had been addressed to his attention. Plaintiffs' Pre-trial Memorandum of Law at 8; *see* Tr. at 23–24, 26–27. This argument fails on two grounds. First, Brophy conceded that his instructions were to deliver registered mail to him personally only if there were some problem with delivery to the Hutton mailroom. Tr. at 39–40. Second, even if the instructions had any force, they were merely oral and were modified by Hutton's subsequent conduct. *See Mellencamp v. Riva Music, Ltd.*, 698 F.Supp. 1154, 1167 (S.D.N.Y.1988); *Rose v. Spa Realty Assoc.*, 42 N.Y.2d 338, 343, 397 N.Y.S.2d 922, 926, 366 N.E.2d 1279, 1283 (1977). Hutton's other claim—that the Postal Service breached its regulations by failing to request identification of Gaillard prior to releasing accountable mail to him—is much ado about nothing. Section 911.41 of the DMM states that "[i]dentification will be required if the applicant for registered mail is unknown." Gaillard's identity was not an issue. He worked for Wall Street and had previously been introduced to postal employees as a

person authorized by Hutton to pick up Hutton's mail. *See* Tr. at 355.[6]

Somehow, the chain of command for establishing procedures in Hutton's mailroom slipped away from officers of the company who were supposed to control them. The system that had previously been established maintained accountability with logbooks in which mailroom employees recorded their receipt of registered mail. It appears that these procedures were initially modified by Wall Street drivers' practice of putting registered mail in mail sacks but they were allowed to flourish under the direction of one of Hutton's mail clerks, whose primary duties were to affix postage and deliver mail on Hutton's floors at 26 Broadway. *See* Tr. at 134–35. Management was possibly informed of the practices but did not stop them. Even if they did not actually know what was happening in their mailroom, however, they should have been aware.

The Postal Service maintained control and accountability up to the point that it obtained Gaillard's signature for each of the parcels. The breakdown in how they were handled occurred after they were properly delivered to Hutton's agent, Wall Street. In their dealings with one another, neither Hutton nor Wall Street insisted on the kind of secure transfers that the Postal Service normally uses for accountable mail. Therefore, while the Postal Service may have had a role in contributing to the initial change in Wall Street's responsibilities, it had no control over how Wall Street and Hutton implemented and adapted to those changes. As the DMM provides, the Postal Service's responsibility ended with the proper delivery of the parcels of coins to Wall Street. DMM § 911.41. In the end, it was Wall Street's and Hutton's mishandling of those parcels, not the Postal Service's interpretation of the letter or subsequent actions, that caused their loss.

## B. *Claims Against Wall Street*

■ At the close of plaintiffs' case, Wall Street moved to dismiss Hutton's complaint for "failure to prove a prima facie case." Tr. at 192. I reserved decision on the motion, *see* Tr. at 196, which I consider to have been made pursuant to Fed.R.Civ.P. 41(b). *See Warren v. Hudson Pulp & Paper Corp.*, 477 F.2d 229, 232 (2d Cir. 1973); 5A J. Moore, J. Lucas, Moore's Federal Practice ¶ 50.03[1] (2d ed. 1988) ("Moore's"). After reviewing the record, it is my opinion that there had been introduced sufficient evidence of Wall Street's negligence—the acceptance of these pieces of accountable mail and the practice of leaving sacks possibly containing accountable mail in the hallway outside Hutton's mailroom—to have warranted denial of Wall Street's motion. *See, e.g.,* Tr. at 104–05, 156–57. In any event, Wall Street subsequently elicited evidence from several witnesses tending to establish its own liability. *See, e.g.,* Tr. at 367–69, 373–74, 379–80, 396, 432–33, 437, 450–51; *see also id.* at 454–55 (urging the court to permit counsel for Hutton to elicit testimony damaging to Wall Street). By doing so it waived its right to have the court consider the sufficiency of plaintiffs' evidence standing alone. *See duPont v. Southern National Bank*, 771 F.2d 874, 881 (5th Cir.1985), *cert. denied*, 475 U.S. 1085, 106 S.Ct. 1467, 89 L.Ed.2d 723 (1986); *Duval v. Midwest Auto City*, 578 F.2d 721, 724 (8th Cir.1978); Moore's ¶ 41.13[1] at 41–167 & n. 16. Therefore, in addressing the claim against Wall Street, I have considered the entire record of the trial.

■ That claim is based on common-law negligence and is, therefore, controlled by New York law. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78, 58 S.Ct. 817, 822, 82 L.Ed. 1188 (1938); *Board of Educ. v. CNA Ins. Co.*, 839 F.2d 14, 17 (2d Cir. 1988). Hutton and Wall Street both had a role in the chain of events culminating in the loss of the two parcels of coins. For

---

**6.** Similarly, Wall Street's claim that there was a violation of some duty of the Postal Service to deliver registered items "hand to hand," *see* Tr. at 312–13, 376–77—when one employee picked up the parcels at the registry cage and then provided them to Gaillard—is misplaced because Gaillard actually signed for the parcels. *See* Tr. at 328–29. Thus, even if there were some violation before the delivery to him, it could not have contributed to these losses.

the purposes of examining Hutton's claim against Wall Street, it does not matter whether Hutton actually requested Wall Street to accept delivery of Hutton's accountable mail, or whether it should be deemed as a matter of law to have done so. Once Wall Street came into possession of the parcels it became a bailee and was required to exercise reasonable care in handling them. *See Eastern Wine Corp. v. New York Cent. R.R. Co.*, 355 F.2d 30, 31–32 (2d Cir.1966); *David Crystal, Inc. v. Cunard Steamship Co.*, 339 F.2d 295, 298 (2d Cir.1964), *cert. denied*, 380 U.S. 976, 85 S.Ct. 1340, 14 L.Ed.2d 271 (1965); *Goldbaum v. Bank Leumi Trust Co.*, 543 F.Supp. 434, 436–37 (S.D.N.Y.1982); *Castner v. Insurance Co. of North America*, 40 A.D.2d 1, 3, 337 N.Y.S.2d 52, 54 (3d Dep't 1972). Its conduct dropped below that standard, making it liable for the resultant losses.

Wall Street's negligence occurred on several levels. Considering Wall Street's experience in the mail business, management's failure to teach employees such as Gaillard the difference between accountable and non-accountable mail was unreasonable. Its claimed instruction to new drivers (presumably including Gaillard) not to sign for customers' mail at the Post Office was, if given, inadequate. As evidenced by the presence of a Wall Street supervisor's signature on a receipt for accountable mail, the failure to train Wall Street employees evidently extended to the supervisory level. *See* Postal Serv. Exh. I; Tr. at 424, 426. Moreover, if these parcels were, in fact, lost because Wall Street left them unprotected in a sack of ordinary mail outside Hutton's mailroom, that act was also negligent. The lack of accountability arising from Wall Street's failure to obtain signatures made it impossible for Hutton to determine whether these parcels were stolen by a Wall Street employee, an unauthorized Hutton employee who discovered

the mail unprotected in the hallway or even a member of Hutton's mailroom. No matter who took them, however, it was Wall Street's act of delivering them without obtaining signatures that unreasonably created the risk that they would disappear without a trace. Therefore, even if its own employees delivered the parcels to Hutton, Wall Street has only itself to blame for creating a situation in which it does not have the evidence to prove that fact.

While Wall Street may have been operating its service negligently, some or all of these practices were known to employees of Hutton. Hutton's acquiescence in Wall Street's practices requires consideration of the doctrines of comparative negligence and assumption of risk. The doctrine of comparative negligence measures the extent to which a plaintiff's own negligence contributed to an injury. *See* W. Keeton, D. Dobbs, R. Keeton, D. Owen, *Prosser & Keeton on Torts* 451 (5th ed. 1984) ("Prosser"). In contrast, assumption of risk cases measure the extent to which a plaintiff has consented to a known risk. *Id.* at 480. An assumption of risk may be express or merely implied, sometimes from conduct that was itself negligent. *Id.* at 482–86. Furthermore, what may look like an assumption of risk may turn out to be contributory negligence[7] or may even involve a combination of the two doctrines. For example, a plaintiff may voluntarily expose himself to the risk of future harm without consenting to relieve the defendant of any future duty to act with reasonable care. *Id.* at 485. In close cases, the line separating the two doctrines may become exceedingly difficult to discern. *Id.*

■ The difference is not merely academic since the application of one doctrine over another may mean the difference between recovery and defeat. New York has adopted the doctrine of comparative negli-

---

7. As an illustration, Professor Prosser gives the following example:

A pedestrian who walks across the street in the middle of a block, through a stream of traffic travelling at excessive speed, cannot by any stretch of the imagination be found to consent that the drivers shall not use care to

watch for him and avoid running him down. On the contrary, he is insisting that they shall [use such care]. This is contributory negligence pure and simple; it is not assumption of risk.

Prosser at 485.

gence by statute. *See* N.Y.Civ.Prac. L. & R. 1411 (McKinney 1976). Besides implementing that doctrine, the relevant statute also addresses the assumption of risk doctrine, stating that it "shall not bar recovery, but the amount of damages otherwise recoverable shall be diminished in the proportion which the culpable conduct attributable to the claimant or decedent bears to the culpable conduct which caused the damages." *Id.; see Lippes v. Atlantic Bank,* 69 A.D.2d 127, 141, 419 N.Y.S.2d 505, 513 (1st Dep't 1979) (finding that the statute applies to cases involving economic injuries). By virtue of this provision, assumption of risk generally does not bar recovery.

In some cases, however, it may still have that effect. For example, a plaintiff cannot recover for an injury if he had expressly assumed and consented to the risk that ultimately caused the harm. *See Arbegast v. Board of Educ.,* 65 N.Y.2d 161, 170, 490 N.Y.S.2d 751, 757–58, 480 N.E.2d 365, 371 (1985); *Akins v. Glens Falls City School Dist.,* 53 N.Y.2d 325, 333, 441 N.Y.S.2d 644, 648, 424 N.E.2d 531, 535 (1981); Prosser at 496. It may similarly bar recovery in cases involving "primary" assumptions of risk, where plaintiffs have chosen to engage in activity fully aware that certain injuries are unavoidable. *See Turcotte v. Fell,* 68 N.Y.2d 432, 438–39, 510 N.Y.S.2d 49, 53, 502 N.E.2d 964, 968 (1986); *Akins,* 53 N.Y.2d at 333; 441 N.Y.S.2d at 648, 424 N.E.2d at 535; Prosser at 485. As the New York Court of Appeals has observed, however, this type of consent "is not constructive consent; it is actual consent implied from the act of the [sic] electing to participate in the activity." *Turcotte,* 68 N.Y.2d at 439, 510 N.Y.S.2d at 53, 502 N.E.2d at 968 (citation omitted).

 Although it should have been apparent to Hutton personnel that Wall Street's acceptance of accountable mail might involve some risk, the facts do not

indicate that Hutton consented to relieve Wall Street of any of its obligations. As noted above, it is impossible to determine how these parcels were actually lost. Since they disappeared on different dates, however, it can be inferred that they were stolen. Nevertheless, there is no basis to infer that Hutton consented, or ever would have consented, to relieve Wall Street of its duty to protect its mail from loss by theft.[8] At most, Hutton could be found to have implicitly consented to the risk that eventually caused it to suffer its injury. Under New York law, however, an implied assumption of risk does not bar recovery; it simply mandates application of principles of comparative negligence. *Arbegast,* 65 N.Y.2d at 170, 490 N.Y.S.2d at 757, 480 N.E.2d at 371; *see* Prosser at 495–96.

 Under those principles, I find that Hutton acted negligently and that its negligence contributed to these losses. For example, I have already discussed the inadequacies of the December 17 letter. In addition, however, had Hutton merely copied Wall Street on it, Wall Street might have recognized the possibility that the letter could be interpreted to include accountable mail. At least that would have given it some opportunity to take appropriate steps to clarify the issue. The record does not establish that Hutton actually knew of the risks involved in allowing Wall Street to accept delivery of its accountable mail but it should have appreciated them and I find that it unreasonably failed to do so. In particular, the mailroom personnel did not realize the risks involved in accepting accountable mail without signing for it. They should have at least told Wall Street's drivers not to place registered mail in sacks with ordinary mail so that mailroom employees could know when they were receiving such mail. They should also have told the drivers not to place registered items in sacks left outside the door under any circumstances.[9] For these reasons, I find

---

**8.** For example, there was no evidence that Wall Street had ever left accountable mail in the sacks outside the Hutton mailroom. Therefore, I cannot conclude that Hutton was aware that accountable mail might be stolen from the hallway.

**9.** When the drivers left bags in the hallway they always subsequently returned to the Hutton mailroom to obtain a signature on a Wall Street receipt anyway, so they could have delivered registered items at that time. *See* Tr. at 421.

that Wall Street and Hutton were equally responsible for the loss of these parcels.

■ Relying on a purported disclaimer of liability on the back of one of its receipts, Wall Street suggests that its liability for the losses should be limited to one hundred dollars. *See* Postal Serv. Exh. H; Tr. at 412–13, 452–53.[10] If Wall Street had, in fact, expressly contracted with Hutton to limit its liability for negligence, that limitation would have been effective. *See David Crystal*, 339 F.2d at 298; *Goldbaum*, 543 F.Supp. at 436; *Willard Van Dyke Productions, Inc. v. Eastman Kodak Co.*, 12 N.Y.2d 301, 304, 239 N.Y.S.2d 337, 339, 189 N.E.2d 693 (1963). In this case, however, its attempt to seek refuge in the notice on the back of the receipt fails. First, there was no agreement in advance of these deliveries to limit Wall Street's liability. The notice appears to have been designed for pickups of customers' outgoing mail but Wall Street apparently also used it for deliveries. Even so, it would be signed only *after* a delivery had occurred. *See* Tr. at 418. Therefore, it would have no application to a failure to deliver. *See Willard Van Dyke*, 12 N.Y.2d at 304, 239 N.Y.S.2d at 340, 189 N.E.2d 693. Not surprisingly, there were no signed receipts for the two parcels since they were never delivered. Second, the law does not favor attempts to avoid liability for one's own negligence. *Id.*, 12 N.Y.2d at 304, 239 N.Y. S.2d at 339, 189 N.E.2d 693. Attempts to enforce such limitations can succeed only when it is "absolutely clear that such was the understanding of the parties. In other words, it must be plainly and precisely provided that limitation of liability extends to negligence or other fault of the party attempting to shed his ordinary responsibility." *Id.* The limitation on the receipt does not define Wall Street's liability for negligence. Consequently, even if the limitation were generally applicable to these deliveries, it would not absolve Wall Street of liability for these negligent acts.

## CONCLUSION

For the reasons stated above I find that the Postal Service is not liable to Hutton for any damages. It is my opinion that Hutton and Wall Street are equally responsible for the losses that occurred: Hutton for allowing Wall Street to accept delivery of its registered mail without implementing appropriate safeguards and for failing to appreciate the risks involved and Wall Street for the manner in which they actually handled these parcels. The actual amount of damages that Hutton seeks against Wall Street is unclear.[11] Under the

---

10. On the front of the receipt was written:
WALL STREET PICK–UP SERVICE
 ————19————
 Received from ——————
 For ——————
 in good order, the following:
 ———— Tubs
 ———— Cartons
 ———— Bags
 ———— ( ) ——————
 Signed by ——————
 See reverse side for terms and conditions
The reverse stated:
 In consideration of the rate charged, it is agreed that the value of this shipment, whether consisting of one or more packages, is not greater than $100.00, and that our liability for such shipment is limited to $100.00, unless a greater value is declared at the time the call is placed with the company, in which event the company will furnish a rate to insure the article for the higher value declared by the sender. We will not be liable for loss or damage to shipments improperly packed or labeled, or for the loss or damage caused by delay. We will not be liable for loss or dam-

age to cash, furs, jewelry, negotiable securities or other high value items, ect. [sic], unless the item or items are declared at the time of placing the call, in order to afford us an opportunity to adequately protect the shipment. All complaints regarding loss or damage of any kind must be submitted in writing within 30 days of delivery of shipment to us. Postal Serv.Exh.H.

11. In its amended complaint, Hutton sought to recover the entire amount of the loss from either the Postal Service or Wall Street. *See* Amended Complaint ¶ 22. In its proposed conclusions of law, however, it requested that the court find Wall Street liable only for $3300, the balance of the loss above the $25,000 it sought from the Postal Service. Counsel for Hutton reiterated this limited theory of liability during his opposition to a motion by Wall Street to dismiss the case at the close of plaintiffs' case and later during his closing statements. *See* Tr. at 193–95, 500; *see also id.* at 195 (counsel for Wall Street characterized Hutton's theory of recovery against Wall Street as seeking only $3300 in damages, with no correction from counsel for Hutton).

Federal Rules, however, "every final judgment shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in the party's pleadings." Fed. R.Civ.P. 54(c); *see Superintendent of Ins. v. Bankers Life & Casualty Co.,* 300 F.Supp. 1083, 1093 (S.D.N.Y.1969), *aff'd,* 430 F.2d 355 (2d Cir.1970), *rev'd on other grounds,* 404 U.S. 6, 92 S.Ct. 165, 30 L.Ed.2d 128 (1971); Moore's ¶ 8.14. Therefore, I find that Wall Street is liable to Hutton for half the cost of the coins, or $26,650 plus interest.

So ordered.